Filed Jan. 13, 1894.

---

No. 16,943.

## Martin v. McCullough, Administrator.

GIFT.—*Inter Vivos.*—*Ante-Mortem Settlement.*— *Trust and Trustee.*— *Agency.*—Where one clearly and intelligently manifests an intention to make a present gift, *inter vivos,* of personal property, and, in consummation of such intention, makes a delivery of the property to one of the immediate beneficiaries of the gift, for the use of the donees, the person to whom delivery is thus made will be presumed, in the absence of countervailing circumstances, to take the property as trustee of the intended donees, and not merely as the agent of the donor.

SAME.—*Trust and Trustee.*—*Principal and Agent.*—In such case, where the donor placed the subject-matter of the gift in the hands of one of the beneficiaries for distribution, the donor thereafter exercising

Martin *v.* McCullough, Administrator.

no dominion over it, nor having sought to exercise any, the gift having been accepted by the donees and partial distribution made before the death of the donor, the custodian of the gift was but the trustee of the donees for the purpose of distribution on the basis directed by the donor; and even assuming that the custodian of the goods was simply the agent of the donor, the donor's death could not operate to revoke the gift, where complete delivery has been made before his death.

From the Harrison Circuit Court.

*C. L. Jewett, D. Alspaugh* and *J. C. Lawler,* for appellant.

*S. H. Mitchell, R. B. Mitchell, J. A. Zaring, M. B. Hottel, F. M. Hostetter* and *W. N. Tracewell,* for appellee.

HACKNEY, J.—The special finding in this case shows that Edmund W. Martin, who was eighty-nine years of age and confined to his bed from paralysis, had six adult children and a second wife, by whom he had no children; that he had accumulated a large sum, which he had invested in notes, bonds, mortgages, and other securities, and that he had also real and personal property of considerable value; that his children, excepting the son Amos, who resided in Illinois, lived near him, and all maintained for him and for each other the most friendly feeling.

To his children, excepting his daughter Polly, who resided with him, he had made advancements in various sums, and it required $7,113 to equalize them, including said daughter Polly.

In the fall of 1889 he concluded to make an *ante-mortem* settlement upon his children, of a portion of his estate, including all of his notes, bonds, securities, and surplus cash, of which fact he advised his sons George, Amos, and Silas, and his daughter Elizabeth May, and directed that his children be first made equal in their

advancements, and that the balance be divided equally among them; and directing that some one of them be selected to take charge of and care for the distribution to which Polly would be entitled, she then being of unsound mind; "that agreeable to this intention and expressed wish, he selected as an agent, trustee and medium through which to carry out and effectuate this arrangement, his son George," and caused this fact to be communicated to him.

Pursuant to his father's said desires, and about the first of February, 1890, George visited his father, who explained his purposes and desires as aforesaid, and "authorized and directed George to take charge of the notes, bonds and securities, and to first equalize the children, and then divide and distribute the remainder equally among the children."

On the 6th and 7th days of February, 1890, George made a list of the notes, bonds, and securities of his father, at his father's house, and in the presence of his father and other members of the family, and took and assumed charge and control of said notes, bonds and securities, with the consent and for the purpose of carrying out the said desire of his father.

On the 12th day of May, 1890, and pursuant to the said direction of his father, George called together all of said children, excepting the daughter Polly, and, by mutual agreement, George was chosen to act in behalf of Polly, and thereupon an accounting was had, "and with said notes and bonds and the proceeds of such as had in the meantime been paid in to said George, they did equalize said children on the basis of the highest amount received as an advancement by such children," thereby distributing $7,113.

In May or June, and in December, 1890, the children made further distributions, consisting of the remaining

notes and bonds that were regarded as solvent, the amount not appearing, "and, by mutual agreement, left the remaining notes and securities in the hands of George Martin to collect and attend to, and be thereafter divided, or the proceeds thereof, as they might prove to be solvent and collectible." That the several amounts distributed aggregated $22,019.59, and the face value of the notes and securities so remaining in the hands of George Martin was $4,718.56, but that of the sum so distributed $5,000 was distributed after November, 1890, the date of the death of said Edmund W. Martin, and being $1,000 each to Polly, Sallie, Elizabeth, Amos and George.

It is further found that George received the notes, bonds and securities from his father, "in trust and as his agent to divide and distribute among the children, including himself, equally; that, at the time of the delivery thereof, the said Edmund W. Martin intended to transfer the possession thereof to his son George as his agent and in trust as aforesaid,    *    *    *    and George now holds and claims the remainder thereof as his own and as trustee for his brothers and sisters."

In December, 1890, George was appointed guardian for his sister Polly, and is charged with the amount of her proportion of the distributions so found.

A demand was made, before this suit, for the return to the administrator of Edmund W. Martin's estate, of all of the notes, bonds, and securities so received by George Martin from his father.

Upon the facts so stated, the court found as conclusions of law:

1. That the distributions made by the appellant before the death of Edmund W. Martin, were valid and passed the cash and securities to the children.

2. That of the $5,000 distributed after the death of

his father, George was liable for $3,952.25, the remaining $1,047.75 having been a note transferred to, and chargeable against, the guardianship of said Polly.

3. That said $4,718.56 of notes in the hands of said George from said last distribution, belong to the assets of said estate.

4. That said George, as the guardian of Polly Martin, should deliver to the appellee said note of $1,047.75, so distributed after the death of said Edmund.

These findings were made upon a complaint by the appellee against the appellant and George Crim, but as the findings were in favor of Crim, we have omitted such of them as relate to his interests.

The findings are manifestly upon the first paragraph of complaint, which avers a wrongful taking of said notes, bonds and securities from the possession of the plaintiff's decedent and from his premises after his death, and an appropriation and conversion thereof, and a demand therefor by the plaintiff.

The assignment of errors is upon the overruling of. a demurrer to each of the two paragraphs of complaint and upon the conclusions of law stated by the court upon the findings of fact.

The disagreement between the parties, in this court, arises upon the value and effect of the facts specially found. It is conceded that the gift, if complete, was a gift *inter vivos* and not *causa mortis*. The. elements constituting such a gift furnish no dispute, but the differences arise upon the conclusion of the court that the appellant was an agent for the decedent, having in his possession, for delivery, the subject of the gift, not having completed his agency at the death of his principal, and that such death operated as a revocation of the agency.

The theory of this conclusion is supported by the ap-

pellee, while the appellant insists that the facts found establish a completed gift, not only by the creation of a trustee and by a delivery of the subject of the gift to such trustee, but by the loss of dominion over it by the donor and the assumption of dominion over it by the donees.

We think it manifest from the facts stated, omitting mere conclusions, that the decedent not only desired to do so, but that the action taken by him was for the purpose of then making an ante-mortem settlement of all of his notes, bonds, etc., upon his children. He directed the manner in which this object should be accomplished, and selected the person through whom it should be effectuated. The person so selected was one of the donees. The notes, bonds, etc., were actually delivered into the custody of this donee, and this without condition as to time, place, or event upon which the gift should become effective. By the agreement of the donor and of the donees, except Polly, George was to represent her not only in the settlement but in receiving, holding and caring for her distributive interest in the subject of the gift. He thereby not only became vested with his own proportion of the notes and bonds, and entitled to exercise full dominion over the same, but became the exclusive custodian, and held the exclusive dominion over the distributive interest of said Polly.

On the 12th day of May, 1890, and before the death of the donor, which occurred in November of that year, the donees came together and exercised dominion over the notes and bonds by distributing to the several donees numbers of them, and again in May or in June, of that year, they exercised dominion over said notes and bonds by the further distribution of all of said notes and bonds that were regarded as solvent, "and by mutual agreement left the remaining notes and securities in the hands of George Martin to collect and attend to and be thereafter

divided, or the proceeds thereof, as they might prove to be solvent and collectible.''

By this exercise of dominion the donees not only signified an acceptance of the gift, but they so far became possessed of the subject of the gift not only to hold in their own right and possession a large proportion thereof, but to constitute said George their trustee to hold, collect, and distribute any further sums which might thereafter be realized from said notes and securities. This act, on the part of the donees, was as effective in completing the delivery to them of the notes and securities as if they had constituted a stranger their representative, and George had made a physical delivery of them to such stranger.

The five thousand dollars' distribution in December, 1890, consisting of notes and cash, was long after the agreement quoted as above from the special finding, and after the said several acts of dominion over the notes and securities so exercised by the donees before the donor's death.

In this view of the findings, it is immaterial whether the appellant was chosen by the donor as an agent or a trustee, as nothing remained for him to do in executing his office, when the father died, and which such death could revoke.

The mere conclusion of the court, as a finding of fact, that George Martin was the agent of the donor for the purpose of executing his gift, is not warranted, and the conclusion of law, evidently drawn from such finding, is without support. The facts very clearly show that the donor parted with all dominion over the notes and securities to George, imparting to George an absolute and unconditional interest in them in his own behalf and as trustee for Polly. The only restraint upon the interests

of the several donees was that George should take pos-
session of the securities, and that the donees should own
them in equal porportions after being made equal in
their advancements from the donor.    No word is found
to have been uttered by the donor retaining to himself
an interest in, possession of, or dominion over, the secur-
ities; on the contrary, the intention is apparent that the
ownership was to pass to the children at once, and that
George was but their trustee to hold the securities for
division on the basis directed by the father.    After the
custody passed to George, the donor exercised no domin-
ion over any portion of the securities, and sought to re-
call no interest in them.

We do not deny the rule contended for, that an unex-
ecuted gift is revocable by the death of the donor, as held
in *Smith, Admr.*, v. *Ferguson*, 90 Ind. 229, and other cases.
Nor do we ignore the rule that a mere agent of the donor,
holding the naked possession, only to execute the direc-
tion of the donor, can not defeat such revocation by acts
performed after the donor's death.    But our holding is
that where one "clearly and intelligently manifests an
intention to make a present gift of personal property, to
another, and in consummation of his intention makes
such a delivery to a third person for the use of the in-
tended donee, as he is then capable of making, consid-
ering the character and situation of the property, the
person to whom delivery is thus made will be presumed,
in the absence of countervailing circumstances, to take
the property as trustee of the intended donee, and not
merely as the agent of the donor." *Shackleford* v. *Brown*,
89 Mo. 546; *Michener* v. *Dale*, 23 Pa. St. 59; *Sessions* v.
*Moseley*, 4 Cush. 87; *Devol* v. *Dye*, 123 Ind. 321.

And we maintain that when it appears, in addition to
these circumstances, that the person to whom such de-
livery is made is one of the immediate beneficiaries, and

receives the deposit coupled with an interest, there can be no reasonable doubt that his possession is that of a trustee for the donees.

This conclusion would defeat the contention of the appellee, even if we were in error in assuming that the gift was completed by a delivery to the donees in the donor's lifetime by the exercise of dominion over the subject of the gift by the donees in the manner found, but of the correctness of such assumption we have no doubt.

As further sustaining our conclusions, we cite *Wyble* v. *McPheters*, 52 Ind. 393, a case, in its essential features, much like the present, also *Gammon Theological Seminary* v. *Robbins*, 128 Ind. 85; *Haxton* v. *McClaren*, 132 Ind. 235; *Miller* v. *Billingsly*, 41 Ind. 489.

The judgment of the lower court is reversed, with instructions to restate its conclusions of law and render judgment for the appellant in accordance with this opinion.

Filed Sept. 27, 1893; petition for rehearing overruled Jan. 25, 1894.