SMITH v. COMMISSIONER OF INTERNAL REVENUE.

No. 4717.

Circuit Court of Appeals, Seventh Circuit.

June 23, 1932.

**534**

This appeal involves a deficiency in federal estate tax in the amount of $7,973.41, under the Revenue Act of 1926, c. 27, 44 Stat. 9, 69, 70, §§ 301(a) (b), 302(a) (c) (26 USCA §§ 1092, and note, 1093, 1094(a, c), which appear in the margin.[1]

John Wesley Smith, referred to hereinafter as decedent, died intestate on February 5, 1927, and at that time was a citizen of the United States and a resident of Muncie, Ind. Prior to that time he had acquired 600 shares of Prairie Oil & Gas Company common stock, of the par value of $100 per share, which he owned on December 25, 1923, certificates for which were in the names of Thomson and McKinnon, bankers and brokers, who had indorsed the certificates in blank. These certificates remained in said brokers' names until after decedent's death.

On December 25, 1923, while decedent and his five children, to wit, Agnes Smith, Earl

[1] Revenue Act of 1926, c. 27, 44 Stat. 9, 69, 70:

"Sec. 301. (a) In lieu of the tax imposed by Title III of the Revenue Act of 1924, a tax equal to the sum of the following percentages of the value of the net estate (determined as provided in section 303) is hereby imposed upon the transfer of the net estate of every decedent dying after the enactment of this act, whether a resident or nonresident of the United States; * * *

"(b) The tax imposed by' this section shall be credited with the amount of any estate, inheritance, legacy, or succession taxes actually paid to any State or Territory or the District of Columbia, in respect of any property included in the gross estate. The credit allowed by this subdivision shall not exceed 80 per centum of the tax imposed by this section, and shall include only such taxes as were actually paid and credit therefor claimed within three years after the filing of the return required by section 304.

"Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

"(a) To the extent of the interest therein of the decedent at the time of his death; * * *

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. * * *"

F. Smith, Ethelyn S. Bayless, Madge I. Wilson, and Carrie G. Burt, were at decedent's home, he (decedent) said to said children: "I am giving you children my Prairie Oil and Gas stock, and I am putting the certificates in Earl's lock box at the bank, in a folder I have with a compartment with each of your names on it; this stock will be divided equally among you five children." At that time he further stated that he would keep, at least temporarily, the dividends from said stock, and he did thereafter receive from Thomson and McKinnon all dividends paid on the stock during his lifetime. He said nothing about retaining any ownership of the stock or the right to revoke the gift, nor did he at that time deliver any stock certificates to any of said children in person.

Decedent and his son, Earl, each had a lock box at the Merchants National Bank, and each had access to both boxes. Earl had none of his own papers in his father's box, and, so far as the record shows, decedent had no papers in Earl's box except the folder hereinafter referred to which contained the certificates in controversy.

Some time within three months after December 25, 1923, decedent placed in Earl's box at the bank a folder containing five envelopes, each marked in decedent's handwriting with the name of one child—one envelope for each of his children. In each envelope decedent placed three certificates totaling 120 shares of the common stock above referred to.

Thereafter Prairie Oil & Gas Company reduced the par value of such capital stock to $25 per share and gave to each stockholder four shares of new stock having a par value of $25 per share for each old share then outstanding. The new certificates issued for the original stock which had been placed in Earl's box were issued in the name of Thomson and McKinnon and were indorsed in blank by them. On or about April 7, 1924, decedent took the original certificates from the envelopes in Earl's box and placed the new certificates in the envelopes in the same proportionate number, that is to say, 480 shares to each child, where they remained unchanged until decedent's death. Of this action on the part of decedent the children had no notification. Earl had seen the certificates after they had been distributed among the five envelopes in the folder in his safe deposit box, but his sisters had never seen them, and the only knowledge they had that the certificates were in the box was imparted to them by Earl and their father. The

certificates were never transferred to the individual names of the children, and they never voted the stock; nor did they receive any notices from the company or the brokers in regard to meetings, dividends, or other corporate matters, and the stock was sold shortly after decedent's death.

Decedent's journal, following the date of December 31, 1923, contains the following entry:

"Dec. 25. Gave to Agnes Smith, Earl F. Smith, Ethelyn S. Bayless, Madge I. Wilson, Carrie G. Burt, 120 shares each of Prairie Oil and Gas stock. Cer. in blank in name of Thomson and McKinnon to be reissued in 3 cer. as follows:

| "20—50—50 | 130,809.00 | |
|---|---|---|
| Original cost | | 130,809.00 |
| Exchanged Apr. 7, 1924 | | |
| for the following $25 shares ea. | | |
| C20280, 81, 82, 83, 84 for 80 shares ea. | | 400 |
| C20275, 76, 77, 78, 79 for 400 shares ea. | | 2,000 |
| | Shares | 2,400" |

The credit on decedent's ledger from the above journal entry is:

| "1919 | | | | |
|---|---|---|---|---|
| May 12 | 200 S.J. 130 | 130,809 | | |
| 1922 | | | 1923 | |
| Dec. 31 | 400 S.J. 44 | 0,000 | Dec. 25 J. 82 | 130,809" |

The state of Indiana assessed an inheritance tax of $16,475.98 on that part of decedent's estate which was situated in Indiana. Petitioner, paying the tax within one year of decedent's death, was allowed a discount of 5 per cent., and he accordingly paid in cash the sum of $15,652.18.

The state of Ohio assessed an inheritance tax of $98.84 on that part of the estate which was situated in Ohio at decedent's death, and allowed a discount of 3 per cent. if paid within one year of accrual, which was done, and the amount paid to the state of Ohio was $95.88.

In the petition for a redetermination of the deficiency as fixed by the Commissioner, petitioner alleged, and the Commissioner in his answer thereto admitted, that in the year of 1923 decedent gave to each of his five children 120 shares of the stock now in controversy. The parties to this action introduced and filed as a part of the record before the Board a written stipulation of facts, which admitted the following facts, among others:

"4. On Christmas day, December 25, 1923, the said decedent gave to each of his five children, to wit: (naming them), 120 shares of the common capital stock of Prairie Oil & Gas Company, having a par value of $100.00 per share."

"6. Said decedent at the time of making the gift aforesaid retained the right thereafter to receive the income from said stock so long as he lived, and did, in fact, thereafter receive all dividends paid on said stock during his lifetime.

"7. After such gift was made, said decedent had access to a safety deposit box of said son, Earl F. Smith, which box contained said stock."

On the foregoing facts the Board held that the shares of stock in question never ceased to form a part of decedent's estate until his death, and were properly included by the Commissioner for estate tax purposes under the Revenue Act of 1926, sec. 302(a). It further held that the credit provided by sec. 301(b) was limited to only such taxes as were actually paid in cash, and did not embrace the discount granted by the state.

J. Murray Chenoweth and Earl B. Barnes, both of Indianapolis, Ind., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key and John G. Remey, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Frank M. Thompson, Jr., Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before EVANS and SPARKS, Circuit Judges, and WILKERSON, District Judge.

SPARKS, Circuit Judge.

There are three questions presented by this appeal: (1) Was the alleged transfer of shares of stock to decedent's children on December 25, 1923, an absolute gift which took effect as of that date? (2) Did the Board err in deciding that the alleged transfer did not amount to an absolute gift, notwithstanding the fact that counsel at the trial had stipulated contrariwise? (3) Where a state inheritance law provides for a discount if taxes are paid within a certain period, and the taxes, reduced by the amount of the discount are paid within such period, is the full amount of the assessed taxes allowable as a credit in determining the federal estate tax, or only the amount actually paid?

In Edson v. Lucas (C. C. A.) 40 F.(2d) 398, 404, the court refers to certain requirements necessary to constitute a valid gift inter vivos: "There must be a donor competent to make the gift, a clear and unmistakable intention on his part to make it, a donee capable of taking the gift, a convey-

ance, assignment, or transfer sufficient to vest the legal title in the donee, without power of revocation at the will of the donor, and a relinquishment of dominion and control of the subject matter of the gift by delivery to the donee."

In Copland v. Commissioner, 41 F.(2d) 501, 504, this court said: "It is essential to a gift inter vivos that it be absolute, irrevocable; that the giver part with all dominion and control over the property; that the gift go into effect at once and not at some future time; and that there be a delivery to the donee, and such change of possession as puts it out of the power of the donor to repossess himself of the property."

It is respondent's contention that the language and acts of decedent with relation to the stock in controversy amounted to nothing more than the expression of an intention on decedent's part to give it to his children at some time in the future, and that it was not a gift inter vivos because there was no delivery of the stock.

It is not denied that the donor was competent to give and the donees were competent to receive the property referred to. We think it cannot be doubted that decedent, on December 25, 1923, intended to give the stock to his children and to part with all dominion and control over it, except his right to the dividends thereon during his life. This intention is quite manifest from his statement made to them on Christmas Day, in which he said: "I am giving you children my Prairie Oil and Gas stock, and I am putting the certificates in Earl's lock box at the bank, in a folder I have with a compartment with each of your names on it; this stock will be divided equally among you five children." All verbs used, except the last, are in the present tense; yet it is quite apparent that the transaction could not be completed on that day because the bank was not open on Christmas Day. He had already written the names of the children on the folder. The stock was indorsed in blank, and for that reason, no doubt, it was not at that time in decedent's physical possession, and quite properly so. At that time, of course, there was no gift, for there was no delivery, and if decedent had died before making a delivery, or if for any reason he had thereafter failed to make a valid delivery, the expressed intention would have availed the children nothing. There was, however, a clear and unmistakable intention on the part of decedent to make a present gift to his children, and he described to them in detail how he intended

to make the delivery; that is to say, by placing the amount of stock intended for each child in a separate envelope with such child's name placed thereon, and depositing the same in his son's lock box at the bank. There were no reservations whatever as to title, dominion, or revocation, except that he retained the right to the dividends during his life, if he so chose. That reservation was merely a limitation on the quantity of the contemplated gift, and in no way affected its validity. Edson v. Lucas, supra.

Some time after Christmas of 1923, the exact time not being known, decedent placed the stock in his son's box at the bank in the exact manner and form as he had told the children on Christmas Day that he would do. The son saw the stock in his box several times and examined it. He could not say just how long after Christmas it was when he first saw the stock in his box, but he was sure it was within three months. The time when decedent deposited the stock in the box seems to us not to be so important or controlling as the fact that he did deposit it just as he had told his children he was going to do. The fact that a donor consumes days or weeks or any length of time in performing the details necessary to constitute a valid gift inter vivos, and in the manner in which he desires to accomplish it, will not in and of itself invalidate the gift. Jacobs v. Jolley, 29 Ind. App. 25, 62 N. E. 1028. The general principle that a gift inter vivos must go into effect at once relates to the delivery rather than to the expression of the donor's intention.

Decedent's expressed intention to make an inter vivos gift to his children, and his belief that he had done so, seem to us to be conclusively proven by the fact that on December 31, 1923, he made an entry in his journal, in his own handwriting, that he had given the stock to his children on December 25, 1923; and on December 31, 1923, he carried this entry to his ledger as a credit against the cost of the same stock which he had purchased in 1919, and he thereupon closed the account.

In cases of gifts, delivery to the actual donee is not necessary; it may be made to a third person for the benefit of donee, and in such event the third person becomes a trustee for the donee. In the instant case the stock was delivered to the custody of Earl F. Smith for the benefit of all the children, including himself, and that constitutes a delivery to the donees. Martin v. McCullough, 136 Ind. 331, 34 N. E. 819; Grissom

v. Sternberger (C. C. A.) 10 F.(2d) 764; Owen v. Commissioner of Internal Revenue (C. C. A.) 53 F.(2d) 329.

It is contended by respondent that the facts that decedent had in his possession a key to Earl's box, and that in a short time after the original certificates had been deposited in that box decedent took them out and exchanged them for new certificates which the company had issued in lieu of the old ones, and replaced the new ones in Earl's box, are inconsistent with an intention on decedent's part to relinquish dominion and control of the bonds.

In determining the intention of parties to a transaction there are many things to be considered other than the statements and acts of the parties. The law does not contemplate that in every event the same effect shall be given to the same words and acts, and this is especially true when the words and acts are uttered and done by different persons. In such cases it is quite proper and necessary to consider the character and nature of the parties concerned, their relation to and confidence in each other; their motives, their subsequent conduct, and anything which throws light upon the intention of the parties concerned under the existing circumstances of the particular case.

In the instant case we have a father dealing with his children. So far as the record reveals, the family is of unquestioned integrity and dominated by love and confidence. There is a clear and unmistakable intention expressed which constitutes a proper basis for a gift inter vivos. He tells them in unequivocal terms what he is then doing and what he expects to do to carry out that intention, which, if done, is sufficient to constitute a gift inter vivos. He carries out and performs every detail of that plan, and we think it is fair to infer, in the absence of any evidence to the contrary, that he did so within less than a week, because he balanced his books with respect to this transaction on December 31, 1923. He retained a key to his son's box, which, so far as the record reveals, he had possessed ever since his son had a box; and his son had always carried a key to his father's box, but neither had any papers or property in the other's box. The fact that decedent retained the key is not of itself sufficient to defeat the gift. Beaumont v. Beaumont (C. C. A.) 152 F. 55; Bingham v. White (D. C.) 31 F.(2d) 574; Stevenson v. Hunter, 131 Kan. 750, 293 P. 500; Brine v. Parker, 271 Mass. 86, 171 N.

E. 324; Hynes v. White, 47 Cal. App. 549, 190 P. 836.

There is no evidence that decedent ever opened his son's box subsequently to the first deposit, except when he exchanged the original stock for the new issue. That act was clearly in the interest of the children and was not inconsistent with the gift. Edson v. Lucas, supra; 6 Fletcher Cyclopedia Corporations, p. 6719.

The general proposition, stated in Copland v. Commissioner, supra, that there must be such change of possession as will put it out of the power of the donor to repossess himself of the property, of course contemplates a lawful repossession. We think that donor in the instant case had no power to legally repossess himself of that stock after he had deposited the original stock in his son's box, and the undisputed evidence is that he never attempted to do so, and we therefore hold that the transaction constituted a gift inter vivos.

Respondent relies upon Hayes v. McKinney, 73 Ind. App. 105, 126 N. E. 497, to support the ruling of the Board. In that case Jacob H. Hayes, who died in September, 1915, was a brother of Leah H. McKinney. Since 1912 he had rented a safety deposit box at the bank with which he did business. Mr. O'Brien, the president of that bank, was decedent's personal friend, adviser, and business confidant. On and prior to March 15, 1915, decedent was the owner of a number of gravel road bonds which with other of his papers he kept in his safety deposit box above referred to. On the last-named date he went to the bank and told O'Brien that he wanted to give his sister Leah $2,000 in gravel road bonds, and requested O'Brien to take that amount out of his gravel road bonds. Decedent thereupon rented a safety deposit box in the name of his sister Leah and paid the rental, and at his request O'Brien took $2,000 of the designated bonds and placed them in an envelope, upon which O'Brien wrote, "The property of Leah H. McKinney," and deposited them in the safety deposit box which decedent had rented for his said sister. Decedent retained one key until his death, and the other key was placed in an envelope, upon which was written the sister's name, and left with the bank, at which time decedent said, "Whenever Leah wants to get in her box, there is her key." Leah was not present during any of said conversation or transaction and knew nothing concerning the contents of the envelope which contained

the bonds until after her brother's death. On May 15, 1915, decedent went to the bank and took the bonds from Leah's box, clipped the coupons therefrom and deposited said coupons to his own account. At that time he told O'Brien that he believed he would put the bonds in his own box, and he did so, stating at that time that he wanted Leah to have the bonds but he intended to collect the interest thereon during his lifetime.

On the facts stated, the court held there was no gift inter vivos because there was no delivery. It stated that it was forced to such conclusion by the facts that no trustee was appointed, that decedent retained a key to the box and collected the interest, and that he removed the bonds to his own box for the purpose of collecting the interest thereon so long as he should live. Under the particular circumstances of that case it is quite obvious that all the facts just mentioned as forming the basis of the court's conclusion were inconsistent with an intention on the part of decedent to part with control and to give complete dominion to his sister. That inconsistency is made more apparent by the fact that in his statement to O'Brien he made no reservations whatever. The fact that the bonds were neither delivered to his sister nor to any one for her benefit is sufficient to distinguish that case from the one at bar. Indeed, the court in the Hayes Case referred to that fact to distinguish the Hayes Case from Devol v. Dye, 123 Ind. 321, 24 N. E. 246, 7 L. R. A. 439, and Grant Trust, etc., Co. v. Tucker, 49 Ind. App. 345, 96 N. E. 487, 489.

In the case last referred to the court said: "It is the law in this state that to make a valid gift inter vivos, it is essential that the article given be unconditionally delivered in the lifetime of the donor, to the donee or to some third person for the use and benefit of the intended donee. If, however, such third person be only the agent of the donor, the death of the latter revokes the authority of the agent, and the gift is defeated. * * * If the property remained under the control of the donor, though in the keeping of the bank, and the bank was subject to his further direction as to its final disposition, then its relation was that of an agent."

In the Hayes Case, which quotes with approval the above language from the Tucker Case, the bonds were not delivered to an agent of the sister. Neither O'Brien nor the bank had any dominion or control over the box or its contents, except for safe-keeping, and it is quite apparent that both decedent and the bank thought that the bank was subject to decedent's further direction as to the box and its contents, for they permitted him to exercise control and authority with respect thereto, even to the extent of removing the bonds from the box rented for the sister and placing them in his own box.

Respondent also calls our attention to the following Indiana cases as supporting the order of the Board: Crawfordsville Trust Co. v. Ramsey, 55 Ind. App. 40, 100 N. E. 1049, 102 N. E. 282, Reasner v. Bohne, 76 Ind. App. 114, 129 N. E. 490, and Smith v. Moore, 77 Ind. App. 455, 133 N. E. 837. A perusal of those cases convinces us that they are in accord with our holding.

It is further contended by respondent that there is substantial evidence in the record to support the Board's conclusion, and that this court has no power to disturb it. If by this contention he refers to the Board's conclusion of law, then we are no more precluded than was the Board by the stipulation of the parties that the transaction amounted to a gift. If he refers to the Board's findings of facts upon which the court's conclusion is based, we cannot agree with his contention, for we are convinced there is no substantial evidence in the record to support his contention as to the facts.

We think petitioner's contention with relation to credit for the state taxes which he has paid is erroneous. The statute is clear and unambiguous, and we think it does not warrant a credit to petitioner for a discount which he never paid. In this respect the order of the Board is affirmed, and in all other respects the order is reversed.