## HOGLE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2566.

Circuit Court of Appeals, Tenth Circuit.

Nov. 25, 1942.

---

John Enrietto, of Washington, D. C. (Charles D. Hamel, of Washington, D. C., G. A. Marr, C. W. Wilkins, and Cheney, Jensen, Marr & Wilkins, all of Salt Lake City, Utah, and Hamel, Park & Saunders, of Washington, D. C., on the brief), for petitioner.

L. W. Post, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to Atty.Gen., on the brief), for respondent.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals and involves income taxes for the years 1934 to 1937, inclusive, assessed against James A. Hogle, petitioner. The Board held that all of the income in question was taxable to Hogle under § 22(a) of the Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int. Rev.Acts, pages 669, 825.

Hogle and Mary C. Hogle, his wife, reside in Salt Lake City, Utah. They have three children, Mary Katharine Hogle McTernan, born June 5, 1911, James E. Hogle, born September 16, 1912, and George H. Hogle, born April 10, 1915.

In 1911, Hogle purchased a seat on the Salt Lake City Stock Exchange. In 1914, he began a local brokerage business under the name of J. A. Hogle & Company. In 1917, he expanded his activities after taking over the Salt Lake City branch of Logan & Bryan. In 1919, he made his wife an equal partner. She never became active in the business, but contributed to the partnership some securities which in 1918 had been given to her by Hogle and placed in a trading account in her name. James E. and Mary Katharine became members of the partnership in 1934 and George H. became a member in 1936. The partnership engages in the stock and bond brokerage business, with its principal office at Salt Lake City and branch offices in New York, Los Angeles, and other cities. Its income is derived from commissions and interest on accounts.

I. The Copley Trust.

On October 7, 1922, Hogle, Mrs. Hogle, and Ed. S. Brooke executed an instrument which stated that it was an "irrevocable trusteeship," and designated Ed. S. Brooke as trustee thereunder for the

three minor children. The instrument recited that "this is a trading account in stocks, bonds and/or real estate, managed and operated under the direction of James A. Hogle for the benefit of his three children."

It provided that the corpus and income of the trust should be divided among the three children on April 15, 1945, in the following proportions: Mary Katharine, one-fifth; James E., two-fifths; and George H., two-fifths.

It further provided that any losses resulting from trading in excess of the "profits and various income returns thereof" should be made good by Hogle, and that any such losses should not become an indebtedness of the trustee or the beneficiaries, but that any such losses made good by Hogle should be returned to him out of the first profits that accrued from further transactions.

It further provided that in case Hogle should incorporate his real estate holdings or the partnership, he could require the trustee to transfer the trust assets for bonds or stock in the corporation and could name a secretary or treasurer of the transferee as successor trustee, but that the new securities thus traded for former assets should be worth not less than the amount of the assets traded for such new securities in the corporations.

It further provided that upon Hogle's death, trading should cease "and all other agreements, circumstances, and conditions" of the "trusteeship" should devolve on Mrs. Hogle, or if she be then dead or should thereafter die before the termination of the trusteeship, on Hogle's executor.

It further provided that in case of a beneficiary's death, his benefits and rights should pass to the surviving children, and in the event of the last surviving child's death, to Mrs. Hogle, and if she should be dead, to the children's living children.

It made no provision for the removal of the trustee but provided in the event of his death, resignation, or removal, Hogle might appoint the successor trustee.

There was no provision whereby Hogle might share in the corpus of the trust or the income therefrom and Hogle reserved no power whatsoever to alter the provision respecting distribution of the corpus or the income therefrom.

On February 5, 1927, Brooke resigned as trustee and an identical trust agreement was executed by Hogle and Mrs. Hogle designating George H. Copley as trustee. The trust was thereafter known as the Copley Trust. Both instruments were drawn by Hogle without consulting an attorney.

On October 7, 1922, at Hogle's direction, a margin account was opened for the trust with the partnership. It was carried on the partnership books in the name of Ed. S. Brooke, Agent, and later was continued in the name of George H. Copley, Trustee. The account was treated by the partnership like the account of any other trading customer.

At Hogle's direction, a short sale of 1,000 shares of Tintic Standard Mining Company was made on October 7, 1922, and covered by purchases on October 10 of 600 shares and on October 21 of 400 shares at a profit of $209.91. There were no further transactions during 1922, and after an interest credit of $2.08 by the partnership, the trust account on December 21, 1922, showed a credit balance of $211.99.

Sales and purchases on margins were made for the account during the succeeding years. With the exception of the years 1928 and 1929, when losses were sustained, the trust realized profits in every year, including the taxable years.[1]

[1] The gains or losses, after considering dividends and interest, for the years 1923 to 1940, inclusive, were as follows:

| Year | Gains | Year | Gains |
|---|---|---|---|
| 1923 | $ 1,865.06 | 1932 | $ 8,207.50 |
| 1924 | 7,338.20 | 1933 | 8,350.20 |
| 1925 | 136,812.15 | 1934 | 8,983.62 |
| 1926 | 22,580.22 | 1935 | 2,162.31 |
| 1927 | 221.07 | 1936 | 42,601.43 |
| 1928 (loss) | —8,047.52 | 1937 | 118,345.06 |
| 1929 (loss) | —143,451.09 | 1938 | 43,466.24 |
| 1930 | 9,557.37 | 1939 | 17,843.67 |
| 1931 | 15,278.24 | 1940 | 42,219.28 |

At the end of 1927, the trust account showed a balance of $157,122.04, representing accumulated profits after deduction of insurance premiums and income taxes paid out of the fund. In 1928 and 1929, at Hogle's direction, securities were credited to the trust and charged to individual accounts of Hogle and Mrs. Hogle and a joint account of Hogle and Mrs. Hogle on the books of the partnership.[2] The trust account was short in respect of the shares transferred. The transferor accounts were long. After the transfers, the trust account was short 600 shares of Tintic Standard, 300 shares of American Smelting, Refining & Mining Company, and 1,200 shares of Park Utah. None of the securities transferred was at any time in the name or custody of either Hogle or Mrs. Hogle. However, they were carried on the books of the partnership as belonging to them and were held in the name of a nominee for their benefit. Stocks of customers generally were carried in the name of a nominee, and beneficial ownership thereof was reflected on the books of the partnership.

The net asset or liquidating value of this account was minus $668,838.02 on December 31, 1927, minus $786,735.61 on December 31, 1928, and $363,132.76 on December 31, 1929.

During the years 1923 to 1934, the partnership disbursed $11,280.48 for premiums on insurance policies on Hogle's life, under which his three children were beneficiaries, and disbursed $20,807.29 for the children's school expenses, and charged them to the trust account. These disbursements were contrary to the provisions of the trust agreement. Hogle was unaware of these charges. On December 31, 1940, the amounts were credited on the partnership books to the trust account, the school expenses were charged to Hogle's account, and the amount of the insurance premiums

was charged to the children's personal accounts. All other disbursements from the trust account since it was opened have been for taxes.

A separate set of books has been kept for the trust which conforms with the account on the partnership's books.

The trust books show that the net asset or liquidating values of the trust account and its debit or credit balances with the partnership at the end of each of the following years, respectively, were:

| | Liquidating Value | Debit | Credit |
|---|---|---|---|
| 1933 | $473,627.35 | $ 9,640.88 | |
| 1934 | 507,446.54 | | $53,763.06 |
| 1935 | 564,311.35 | | 51,650.25 |
| 1936 | 663,046.24 | 282,811.98 | 6,049.84 |
| 1937 | 801,679.96 | 366,000.64 | |
| 1938 | 752,104.40 | 14,217.76 | |
| 1939 | 765,838.58 | 597,969.88 | 14,685.84 |
| 1940 | 745,008.70 | | |

In 1927, Hogle and Mrs. Hogle discussed trust policy and intended gifts with Copley, the trustee. Copley moved to Imlay, Nevada, in 1928, and thereafter made occasional trips to Salt Lake City. The trust's tax returns and trading sheets were mailed to him. He signed the returns and mailed them back. He took no action with respect to the trading account or any other trust matters. Hogle directed the trust's business operations.

Prior to 1932, James E. and George H. each reported two-fifths of the taxable net income of the trust on their individual income tax returns, and Mary Katharine reported one-fifth. As a result of the Commissioner's determination that the income attributable to the trading account was not distributable by the trustee, the trustee reported the income for 1932 and succeeding years and paid the tax thereon.

---

[2] The shares transferred, the date of transfer, and the value thereof were as follows:

| Date | Shares Transferred | Value at Transfer |
|---|---|---|
| 6/18/28 | 51,600 Tintic Standard | $744,588.00 |
| 6/21/28 | 6,975 Silver King Coalition Mines | 78,990.60 |
| 4/25/29 | 100 Utah Copper | 15,050.00 |
| 4/25/29 | 3,000 American Smelting & Refining Co. | 313,500.00 |
| 4/25/29 | 600 Kennecott Copper | 51,600.03 |
| 4/25/29 | 1,847 Park Utah Cons. Mining Co. | 18,931.75 |
| 4/25/29 | $10,000 Brazil 4's (bonds) | 3,627.50 |

Of the shares transferred, 10,000 Tintic Standard and 1,165 Silver King were drawn from Hogle's account, 5,100 Silver King from Mrs. Hogle's account, and the remainder from the joint account.

The net taxable income attributable to the trust on which the tax was so paid for the years here involved was as follows: 1934, $5,757.36; 1935, $255.37; 1936, $35,873.57; 1937, $93,541.35. The Commissioner included those amounts in Hogle's income for such years, respectively.

The terms of the trust agreement clearly precluded Hogle and Mrs. Hogle from revesting in either of them either the corpus or the income therefrom. Under its provisions Mrs. Hogle was to become a beneficiary only in the event of a contingency not under her control and not certain and not likely to occur. Reservation in Hogle of the power of management did not make the trust revocable where there was no power in Hogle to derive any economic benefit either from the corpus or the income therefrom.[3] We, therefore, conclude that the trust was irrevocable.

It does not follow, however, that all the income derived by the trust was taxable to the trust or the beneficiaries. It was contemplated that Hogle would devote a portion of his time and efforts to carrying on trading in securities and commodities for the benefit of the trust, and that any profits realized from such trading would inure to the trust. The income thus created and the profits thus realized were not merely income accruing from the corpus of the trust or from capital gains realized from disposition of corpus, but were profits earned through trading on margins involving the exercise of personal skill and judgment of Hogle, and were in substance personal earnings of Hogle. The amount of trading on margins which Hogle was to carry on for the trust was wholly in his discretion. He could trade little or much or not at all for the benefit of the trust as he saw fit. Thus, he exercised practical control over what portion of income from his personal efforts in trading on margins should accrue to the trust.

Hogle allocated to the trust in each of the taxable years in question such portion of his personal efforts in trading on margins as he saw fit. In substance, he gave to the trust in each of those years the profits derived from a designated portion of his individual efforts. It amounted in each of those years to a voluntary assignment of a portion of his personal earnings. An arrangement for distribution of earnings of the head of a family among members of his family group should be subjected to special scrutiny.[4] Income that is subject to a man's unfettered command and that he is free to enjoy at his own option should be taxed to him as his income, whether he sees fit to enjoy it or not.[5]

On the other hand, after the earnings which arose from trading on margins passed to the trust they became part of the corpus of the trust and were no longer within Hogle's control. Once they fell into corpus, the rights of the beneficiaries thereto and to the income therefrom were irrevocable. It follows, we think, that the income from the corpus of the trust in the form of dividends, interest, and capital gains derived from outright sales of corpus, as distinguished from trading on margins, was taxable to the trust or the beneficiaries. Such income accrued not from the personal efforts of Hogle, except indirectly through his management, but from the corpus of the trust, and the rights of the beneficiaries to such income were irrevocable.

The record does not disclose the amounts of income accruing to the trust from trading on margins and the amounts realized from dividends and interest accruing to corpus, and capital gains realized from disposition of corpus. But it does definitely show that substantial portions of the income accruing to the trust were from dividends and interest accruing to corpus and capital gains.

---

3 Jones v. Norris, 10 Cir., 122 F.2d 6; Donahue v. Commissioner, 44 B.T.A. 329, 332, 333; Commissioner v. Branch, 1 Cir., 114 F.2d 985, 987, 132 A.L.R. 839; Helvering v. Palmer, 2 Cir., 115 F.2d 368; Suhr v. Commissioner, 6 Cir., 126 F.2d 283, 287; Commissioner v. Betts, 7 Cir., 123 F.2d 534, 537, 538; Commissioner v. Armour, 7 Cir., 125 F.2d 467, 469, 470.

4 Helvering v. Clifford, 309 U.S. 331, 335, 60 S.Ct. 554, 84 L.Ed. 788; Jones v. Norris, 10 Cir., 122 F.2d 6, 10.

5 Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916; Helvering v. Horst, 311 U.S. 112, 117, 118–120, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Burnet v. Leininger, 285 U.S. 136, 141, 142, 52 S.Ct. 345, 76 L. Ed. 665.

We conclude, therefore, that the earnings derived from the personal efforts of Hogle from trading on margins during each of the several years in question should be taxed to Hogle and that the other income inuring to the trust should be taxed to the trust or the beneficiaries thereof.

## II. The Three Trust.

In 1932, after a revenue agent had called Hogle's attention to the fact that no distribution of income could be made from the Copley Trust prior to its termination, Hogle decided to establish a trust from which income would be available to the children in the event the partnership should suffer financial reverses, and in order to create an estate for the children. On April 15, 1932, Hogle and Mrs. Hogle and Copley, J. C. Johnson, and W. G. Seley executed a trust agreement. It stated that it was an "irrevocable trusteeship" and designated Copley, Johnson, and Seley as trustees for the three children. The instrument recited that "this is a trading account in stocks, bonds and/or real estate, managed and operated under the direction of James A. Hogle for the benefit of his three children." It provided that the children should share in the "profits, benefits, and income" in the following proportions: Mary Katharine, one-fifth, James E., two-fifths, and George H., two-fifths; that trading should be carried on under the name of Three Trust Account, but that individual accounts should be carried for each child; that each child's account should be credited with his proportionate share of the profits and income, and charged with disbursements and expenditures made on his behalf; that the "profits, benefits, and income" credited to a particular child could be expended for his support and benefit "at the discretion and direction of James A. Hogle and at least two of the said trustees," and in the event of the death, disability, or inability of Hogle to act, then with the approval of all the surviving trustees; that on April 15, 1950, the corpus and accumulated income remaining to the credit of each child should be transferred and delivered to such child.

It further provided that a trustee could be removed and his successor appointed by the joint decision of Hogle and any two trustees; that in the event of the resignation of a trustee his sucessor should be named by Hogle if living, and if dead, by the surviving trustees.

It further provided that in the event of the death of any one of the three children, without issue, before April 15, 1950, the corpus and accumulated income credited to such child should pass and be shared equally by the two surviving children; and that if either of the two remaining children should die, without issue, before April 15, 1950, the corpus and accumulated income should pass to the survivor, and if the latter should die, without issue, before April 15, 1950, the corpus and accumulated income should pass and be immediately transferred to Mrs. Hogle; that if any of the three children should die before April 15, 1950, leaving issue, then such issue should share equally in the corpus and accumulated income credited to the parent of such issue, but that future income should not accrue to the issue of such deceased parent; and that no final disbursement should be made to a child of a deceased child until the former had reached the age of twenty-five years.

It contained the same provisions with respect to transferring the assets of the trust in exchange for stock or bonds of corporations formed to take over the real estate holdings or the partnership and for making good losses of the trust as did the Copley Trust.

It provided that upon Hogle's death, all trading should cease "and all other agreements, circumstances, and conditions of this trusteeship" should "be assumed and devolve upon" the three trustees or their successors.

There was no provision whereby Hogle might share in the income or corpus of the trust, except the income which accrued to the individual share of George H. during his minority, and he reserved no power whatsoever to alter the provisions respecting the distribution of income and corpus.

Shortly before the execution of the Three Trust agreement, Hogle had caused a margin account to be opened on the books of the partnership in the name of Three Trust account. Thereafter, purchases and sales of stocks, bonds, and grain were made for this account on margins at the direction of Hogle. In every year, including the taxable years involved, the

account has realized gains from transactions in stocks, bonds, and grain.[6]

To meet the requirements of the New York Stock Exchange in respect to margins, Hogle during 1933 and 1934 pledged with the partnership, which had the use of a partner's exchange seat, a sufficient amount of his personally-owned securities to properly margin the Three Trust account.

The Three Trust account has been treated by the partnership like the account of any other customer. The trustees never directed purchases or sales. Hogle alone directed its business operations.

A separate set of books of account has been kept for the trustees of the Three Trust account, which conforms with the account on the partnership's books. Individual accounts were not kept until 1935. In that year, the credit balance in the account was transferred to the accounts of the individual beneficiaries as follows: Mary Katharine, $2,615.48; James E., $5,230.96; and George H., $5,230.96. At the end of each subsequent year the net earnings or profits were credited to the individual accounts of the beneficiaries in the proportion of each beneficiary's interest. No withdrawal of earnings or profits was made until June 24, 1939. On that date, Mary Katharine withdrew $30,000, James E., $60,000, and George H., $60,000. The withdrawals were effected by debits to the Three Trust account on the partnership books and credits to the beneficiaries' personal accounts with the partnership. James E. and George H. were then equal partners with Hogle and Mrs. Hogle in the partnership. Mary Katharine had withdrawn from the partnership on May 31, 1939.

No part of the income of this trust was ever used for the support, maintenance, or education of a beneficiary during minority.

For 1933 and 1934, the trustees of the Three Trust account filed an income tax return of the net income attributable to the Three Trust account and paid the tax thereon. For 1935, 1936, and 1937, the trustees filed a fiduciary income tax return, in which the taxable net income attributable to the Three Trust account was shown as distributed or distributable to the three beneficiaries. For 1935 and subsequent years, the beneficiaries reported in their respective income tax returns, their respective distributable shares of the net income of the Three Trust account, as reported on the fiduciary returns, and paid the tax thereon.

The Three Trust account's taxable net income was $5,094.08 in 1934, $9,756.41 in 1935, $86,602.07 in 1936, and $60,842.93 in 1937. The Commissioner included those amounts in Hogle's income for the years 1934 to 1937, respectively.

What we have said with respect to the Copley Trust applies equally to the Three Trust, except as to the income which accrued to the individual share of George H. during his minority. George H. reached his majority on April 10, 1936. The income which accrued to his individual share during 1934, 1935, and from January 1, 1936, to April 10, 1936, could have been used for his support and maintenance during his minority at the direction of Hogle and two of the trustees. None of

[6] During the years 1933 to 1940, inclusive, purchases and sales for the account resulted in the following gains as shown on the books, after considering interest and dividends:

| | | | |
|---|---|---|---|
| 1933 | $ 4,056.17 | 1937 | $61,411.05 |
| 1934 | 9,115.02 | 1938 | 92,304.33 |
| 1935 | 22,764.03 | 1939 | 26,447.65 |
| 1936 | 125,142.20 | 1940 | 26,246.44 |

Its debit balance on the partnership books, the cost of securities and commodities held by it, the market value thereof, and its net asset or liquidating value at the end of each of the following years, respectively, were:

| | Debit Balance | Cost | Market Value | Liquidating Value |
|---|---|---|---|---|
| 1932 | $ 21,653.22 | $ 21,449.43 | $ 25,267.50 | $ 4,021.86 |
| 1933 | 281,438.22 | 285,400.60 | 307,030.00 | 25,591.78 |
| 1934 | 538,841.61 | 551,919.01 | 591,085.48 | 52,243.87 |
| 1935 | 576,396.40 | 612,237.83 | 940,313.92 | 363,917.52 |
| 1936 | 369,561.91 | 530,545.54 | 1,374,910.98 | 1,005,349.07 |
| 1937 | 289,047.75 | 511,442.43 | 721,780.83 | 432,733.08 |
| 1938 | 178.004.51 | 492,703.52 | 702,650.18 | 524,645.67 |
| 1939 | 307,410.64 | 493,483.05 | 633,632.58 | 326,221.94 |
| 1940 | —8,595.88 | 203,722.97 | 214,265.53 | 222,861.41 |

the trustees had an adverse interest in such disposition of that income.

Sections 167 of the Revenue Acts of 1934, 48 Stat. 729, and 1936, 49 Stat. 1707, 26 U.S.C.A. Int.Rev.Acts, pages 727, 895, in part provide:

"Where any part of the income of a trust— * * *

"(2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; * * * then such part of the income of the trust shall be included in computing the net income of the grantor."

 Hogle was obligated to support George H. during the latter's minority. Snow v. Snow, 13 Utah 15, 24, 43 P. 620; Rockwood v. Rockwood, 65 Utah 261, 268, 236 P. 457. The possibility of the use of the income accruing to the individual share of George H. during the years 1934, 1935, and from January 1, 1936, to April 10, 1936, to relieve Hogle pro tanto of his parental obligation was sufficient to bring that income within the rule of attribution laid down in Douglas v. Willcuts, 296 U.S. 1, 9, 56 S.Ct. 59, 80 L.Ed. 3, 101 A.L.R. 391, and Helvering v. Stuart, 63 S.Ct. 140, 87 L.Ed. ——, decided Nov. 16, 1942, and such income was, therefore, taxable to Hogle.

III. The Children's Personal Accounts.

On November 23, 1917, individual accounts were opened on the partnership books for Mary Katharine and James E., who were then 6 and 5 years of age, respectively. On May 9, 1918, an individual account was opened on the partnership books for George H., who was then 3 years of age. Numerous small credits of cash, Liberty Bonds, and interest were thereafter made to these accounts from time to time. In 1933, Hogle made gifts of $5,000 to each of his children charging his personal account with the partnership and crediting each of the children's individual accounts.

During the years 1934 to 1937, inclusive, Hogle and Mrs. Hogle, by transferring cash and securities from their respective accounts to the children's individual accounts, made several large gifts in equal amounts to each child.[7]

The transfers were recorded as gifts on the partnership books. Hogle and Mrs. Hogle filed gift tax returns of the transfers, subject to gift taxes, made by them, respectively, and gift taxes were paid thereon.

During the years 1935 to 1940, inclusive, the children made the following withdrawals from their respective accounts under the Three Trust:

| Year | Mary Katharine Hogle | James E. Hogle | George H. Hogle |
|---|---|---|---|
| 1935 | $ 1,062.31 | $ 849.39 | $ 701.25 |
| 1936 | 4,114.27 | 6,557.90 | 1,867.58 |
| 1937 | 13,682.95 | 24,715.52 | 21,698.90 |
| 1938 | 12,694.32 | 23,922.90 | 17,711.01 |
| 1939 | 12,390.32 | 20,708.14 | 13,670.31 |
| 1940 | 11,555.62 | 49,763.32 | 20,335.99 |

No money from any of these accounts was used for the maintenance, support, or education of any child during minority.

At the end of 1940 the net liquidating values of the accounts were: Mary Katharine, $235,503.18; James E., $140,791.42; and George H., $173,205.04.

---

[7] The date, the amount credited to each child, and the account debited were as follows:

| Date | Credit | Account Debited |
|---|---|---|
| Jan. 6, 1934 | $ 5,000.00 | James A. Hogle |
| May 7, 1934 | $25,000.00 | James A. Hogle |
| Dec. 31, 1934 | $ 5,000.00 | James A. Hogle |
| Feb. 15, 1935 | 45 sh. U. S. Smelting, Refining & Mining Co. | James A. Hogle |
| Nov. 12, 1935 | 358 sh. U. S. Smelting, Refining & Mining Co. | James A. Hogle |
| June 10, 1935 | 100 sh. Utah Fire Clay | Mary C. Hogle |
| Aug. 21, 1935 | 800 sh. Silver King | Mary C. Hogle |
| Aug. 21, 1935 | 100 sh. Continental Can | Mary C. Hogle |
| Dec. 27, 1935 | 1500 sh. Silver King | Mary C. Hogle |
| Dec. 31, 1935 | $12,000 | Mary C. Hogle |
| Feb. 14, 1936 | $ 5,000 | James A. Hogle |
| Dec. 21, 1936 | $ 5,000 | Mary C. Hogle |
| Mar. 4, 1937 | $ 5,000 | James A. Hogle |
| Mar. 4, 1937 | $ 5,000 | Mary C. Hogle |

The net income of each account, consisting of interest, dividends, capital gains, and in 1937, underwriting commissions, was as follows: 1934, $3,428.35; 1935, $6,746.23; 1936, $25,600.64; and 1937, $38,849.84.

Each child reported and paid income tax on the net income of his respective account for such years. The Commissioner included such income in the income of Hogle for such years.

■ It is urged that there were no consummated gifts of stock, cash, or credits. The shares sought to be transferred as gifts to the children by Hogle and Mrs. Hogle were held in the name of a nominee, an employee of the partnership. Hence, the legal title was in the nominee who held the shares for the beneficial owners. It is customary for brokerage houses to carry the legal title to stocks in the names of designated nominees and to transfer beneficial ownership by entries on the books of the nominee or of the brokerage house. Such an entry, in our opinion, effectually transfers the beneficial title. The book entries were, in effect, an instruction by the donors to the nominee to deliver the shares to the children on demand. The stock was in the possession of the nominee. After the book entries were made, he held it for the benefit of the children and his possession was sufficient delivery to consummate the gifts.[8]

■ The charges and debits on the books of the partnership made at the instance of Hogle and Mrs. Hogle were also an effective transfer of the credits,[9] both Hogle and Mrs. Hogle having substantial credits against which the transfers could be debited.

We conclude that the gifts were effective, and that the income therefrom belonged to the children and was not taxable to Hogle.

## IV. Temporary Joint Account.

■ On April 22, 1936, while the children were equal partners with their parents, a joint trading account was opened in their names on the partnership books under the designation of "Miss Mary Katharine, James E. and George H. Hogle, Special." Six hundred shares of stock of United States Smelting, Mining & Refining Company were purchased with partnership funds and charged to this account. This was done at Hogle's direction, but after discussion of the purchase with the children. No other purchases or sales were made for this account. The account was credited with dividends paid on the stock and charged with interest on its debit balance. In 1937, the account was closed by charging one-third of the debit balance to the personal account of each child on the partnership books and crediting his account with 200 shares of stock. The shares are still held in the children's personal accounts. The dividends exceeded the interest charged for 1936 and 1937 by the amounts of $1,001.94 and $697.15, respectively. The Commissioner included those amounts in Hogle's income for those years, respectively.

At the time this account was opened the three children were all of age and equal partners in the firm. The personal accounts of the three children as partners in the firm amply secured repayment to the firm. The 600 shares of stock became the property of the children when purchased. Hogle had no control over the dividends. They belonged to the children. We conclude that they were taxable to the children and not to Hogle.

## V. The Underwriting Commission.

In April, 1937, Hogle informally agreed to purchase from Rico Argentine Mining Company, a Utah corporation, so much of 900,000 of newly authorized shares to be issued by it as should not be purchased by its shareholders on or before June 9, 1937, and to pay 10 cents a share therefor on or before June 24, 1937, in consideration of the transfer to him of 100,000 fully-paid shares held in Rico Company's treasury.

Thereafter, on April 29, 1937, Hogle entered into a written agreement with his children,[10] Copley, as trustee, and Bonneville-on-the-Hill, a Utah corporation, whereby each child became obligated to purchase 10 per cent and the trustee and the

---

[8] Smith v. Commissioner, 7 Cir., 59 F. 2d 533, 536, 537; Harmon v. McFarlane, 135 Miss. 284, 99 So. 566, 567; McKenzie v. Harrison, 120 N.Y. 260, 24 N. E. 458, 460, 8 L.R.A. 257, 17 Am.St. Rep. 638; Scoville v. Vail Investment Co., 55 Ariz. 486, 103 P.2d 662, 666; Rasmussen v. Sevier Valley Canal Co., 40 Utah 371, 121 P. 741, 743, 744; 28 C.J., § 59, pp. 658, 659.

[9] Tracy v. Commissioner, 6 Cir., 70 F. 2d 93, 94; Finucane v. United States, 21 F.Supp. 122, 124, 85 Ct.Cl. 663. See also, cases cited in Note 8.

[10] The children were then of age and members of the partnership.

Hill Company each became obligated to purchase 30 per cent of the Rico Company's shares not purchased by its shareholders on or before June 9, 1937, and to pay therefor 10 cents a share on or before June 24, 1937. In consideration of such agreements, Hogle agreed to assign and deliver to each member of the underwriting syndicate a corresponding percentage of the 100,000 shares of stock as and when received by him. On April 30, 1937, Hogle entered into a written contract with the Rico Company to underwrite an issue of 900,000 shares of stock of the Rico Company by purchasing at 10 cents per share so much of the issue as should not be purchased by shareholders of Rico Company by June 9, 1937, and in such agreement the Rico Company agreed upon execution of the contract to deliver to Hogle 100,000 fully-paid shares of its treasury stock.

Hogle was called upon to purchase 510,-621 shares of Rico Company under the underwriting agreement. The stock was paid for on June 14, 1937, by the partnership's check, and the respective accounts of Hogle and the three children on the partnership books were each charged with 10 per cent of the purchase price, and the accounts of the Hill Company and Copley, Trustee, on the partnership books were each charged with 30 per cent of the purchase price. The stock was issued June 16, 1937, in the name of an employee of the partnership and was credited to Hogle, the three children, the Hill Company, and Copley, Trustee, in proportion to the charges made against each, respectively.

On June 11, 1937, 100,000 shares were issued in the name of the same employee and on June 16, 1937, these shares were credited to the accounts of the six participants in the underwriting in the proportion of the charges made against each, respectively.

The market value of the shares received by the participants was reported by them in their several income tax returns for 1937. The Commissioner included $10,000, representing the aggregate value of the commission shares, in Hogle's income for 1937.

■ A majority of the court is of the opinion that Hogle, prior to the agreement of April 29, 1937, had individually agreed to purchase all of the issue of stock not purchased by shareholders of the Rico Com-

pany on or before June 9, 1937; that the Rico Company agreed to deliver the commission stock to Hogle on his individual credit and for his personal promise to purchase and pay for the unsold portion of the issue; that Hogle, therefore, earned the commission and under the authority of Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81, and Duran v. Commissioner, 10 Cir., 123 F.2d 324, Hogle was taxable on all of the income arising from the commission stock.

The writer of this opinion is unable to agree with that view. The Board expressly found that the contract with Rico Company was made on April 30, 1937. It is true that the agreement with the children, Copley, Trustee, and the Hill Company recited that Hogle had underwritten 900,000 shares of Rico Company stock and in consideration thereof Rico Company had agreed to deliver to Hogle 100,000 shares of treasury stock as commission. Undoubtedly, this reference was to an informal commitment made before the formal undertaking was executed on April 30. It seems clear to me that after Hogle had informally agreed upon the terms of the underwriting contract with Rico Company, he formed a syndicate composed of himself, the three children, Copley, Trustee, and the Hill Company, to underwrite the issue of stock. The formation of such a syndicate is an ordinary arrangement with respect to underwriting transactions. At the time Hogle formally contracted with the Rico Company to underwrite the stock issue and receive the commission, he was acting in behalf of himself and the other participants in the syndicate. The contract was made in behalf of Hogle and the other members of the syndicate. Under well-recognized principles of agency, the promise of each member of the syndicate to purchase a stipulated percentage of the stock could have been enforced by the Rico Company.[11] Hogle in his contract with Rico Company did not undertake to perform personal services, but merely assumed an obligation to purchase or underwrite. The commission was earned by the performance of the obligation to purchase. Each member of the syndicate contributed to the performance of the underwriting agreement by purchasing, in accordance with the contract of April 29, the specified proportion of the unsold stock and shared in the commission in proportion to those pur-

11 Adams v. Barron G. Collier, Inc., 8 Cir., 73 F.2d 975, 977, 978; Love v. St. Joseph Stock Yards Co., 51 Utah 305, 169 P. 951, 954.

chases, respectively. The commission stock of the members of the syndicate, other than Hogle's share, did not pass to Hogle. It passed directly to the other members of the syndicate and not through Hogle. Hogle did not earn, did not receive, and did not enjoy nine-tenths of the commission which accrued directly to the other members of the syndicate. To hold Hogle taxable upon the entire commission would be to sacrifice substance and reality to form. It is my view that only 10 per cent of the market value of the commission stock should have been included in Hogle's income.

Reversed and remanded with instructions to grant a rehearing, ascertain the facts, and redetermine the taxes for the years 1934 to 1937, inclusive, in accordance with this opinion.

BRATTON, Circuit Judge (dissenting in part).

The Copley Trust and the Three Trust were irrevocable trusts. The trust instrument in each instance provided that petitioner should manage the trust estate, and he did devote part of his time and efforts to their management. But that was not enough to warrant a division of the realized gain into two parts, one taxable to the beneficiaries of the trust and the other to petitioner. In recent cases of this kind where the instrument creating an irrevocable trust provided that the settlor should manage the trust estate, it was held by this court and others that the entire realized gain should be treated as income of the trust estate. Jones v. Norris, 10 Cir., 122 F.2d 6; Commissioner of Internal Revenue v. Branch, 1 Cir., 114 F.2d 985; Commissioner of Internal Revenue v. Armour, 7 Cir., 125 F.2d 467. True, the question of dividing the gain into two parts, one representing income of the beneficiaries of the trust and the other income of the settlor, was not discussed in any of those cases. But there is nothing in any of them which indicates that the court entertained the view even remotely that authority for such a division is to be found in any mandate of Congress. And in the more recent case of Helvering v. Stuart, 63 S.Ct. 140, 87 L.Ed. ——, it was said that economic gain realized or realizable by the taxpayer is essential to produce a taxable income; that such gain need not be actually collected by him; and that he may give away the right to receive it. By each of these trust instruments, petitioner gave to the trust

estate the right to receive and enjoy the economic gain realized from his time and efforts devoted to its management. All of the taxable income of each trust should be taxed to the estate or the beneficiaries. None of it should be taxed against petitioner, except that part which accrued to the individual share of George H. Hogle in the Three Trust during his minority.