RICHARD RUBIN AND HELENE RUBIN, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2075-66.   Filed November 14, 1968.

*Martin D. Ginsburg* and *Leonard A. Messinger*, for the petitioners.
*James Q. Smith* and *Jay J. Lander*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies of $22,521.72 and $15,762.67 in petitioners' income tax for the taxable years 1960 and 1961, respectively. By amendment to his answer, respondent requested an increase of $9,541.33 in the deficiency for the taxable year 1961. Respondent concedes that the deficiency determined for the taxable year 1960 should be reduced by $16,549.68. The deficiencies presently asserted, therefore, are $5,872.04[1] and $25,304 for the taxable years 1960 and 1961, respectively.

[1] This figure is apparently in error. Subtracting $16,549.68 from $22,521.72 results in $5,972.04.

Prior to the trial herein, petitioners conceded one of the issues raised by the pleadings. The only substantive issue remaining is whether petitioners are taxable on the net income which Park International, Inc., received from Dorman Mills, Inc., as fees for management services rendered by petitioner Richard Rubin under a contract between the two corporations. On this issue, respondent is proceeding under section 61 [2] and, alternatively, under section 482. In addition to the substantive issue, there are procedural issues concerning the burden of proof and the right of respondent to proceed under section 482.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Richard Rubin and Helene Rubin are husband and wife. They filed Federal joint income tax returns on the cash method, calendar year basis for the taxable years 1960 and 1961 with the district director of internal revenue, Brooklyn, New York. They were legal residents of Scarsdale, N.Y., when they filed the petition in this case. Helene Rubin is a petitioner only because she filed joint returns with her husband. Richard Rubin is hereinafter referred to as Richard or petitioner.

Richard graduated from Brown University in 1951, having majored in economics. Upon graduation he went to work for Rubin Bros., Inc. (hereinafter referred to as Rubin Bros.), a family company.

Rubin Bros. was incorporated in New York in the early 1940's. It was the successor to a partnership with a similar name. The original shareholders of Rubin Bros. were George, Sam, and Mack Rubin, who were also the partners of the terminating partnership. Mack Rubin was the father of William Rubin (hereinafter referred to as William), Larry Rubin (hereinafter referred to as Larry), and Richard. George Rubin and Sam Rubin were uncles of Richard, William, and Larry.

During the years relevant herein, the business of Rubin Bros. was the purchase and resale of wool waste. Rubin Bros. purchased wool waste throughout the world, doing 80 to 90 percent of its purchasing in Europe. It then paid another concern, Steiner & Co.,[3] to reprocess the wool waste into fiber. Rubin Bros. then sold the fiber to textile mills throughout the country.[4]

---

[2] All statutory references are to the Internal Revenue Code of 1954.

[3] During the years here in issue, Steiner & Co. was owned 50 percent by Rubin Bros. and 50 percent by persons unrelated to Rubin Bros.

[4] Subsequent to the years here in issue, Rubin Bros.' name was changed to Delaware Industries, Inc.

During the years here in issue, Rubin Bros. had three wholly owned subsidiaries, Wythe Fiber Corp. (hereinafter referred to as Wythe), Milford Processing Co., Inc. (hereinafter referred to as Milford), and Delaware Wool Co. Delaware Wool Co. was a broker of virgin-wool fiber. Wythe purchased orlon and nylon waste and paid Milford to reprocess the waste into fiber. Wythe then sold the fiber to textile mills throughout the country.

After about a year in the fiber business, Richard began to assume greater responsibility in Rubin Bros. During the fiscal year ended July 31, 1952, he was elected a vice president of Rubin Bros., which office he continued to hold through the fiscal year ended July 31, 1959. He served as president of Milford from 1954 to 1955.

Dorman Mills, Inc. (hereinafter referred to as Dorman Mills), was incorporated in West Virginia on February 9, 1927. It has always been a manufacturer of textile fabrics. It was organized at the behest of members of the Dorman family. No member of the Dorman family is related to any member of the Rubin family.

Beginning in 1941 and continuing through the years in issue, Dorman Mills was a customer of Rubin Bros. Dorman Mills purchased approximately 50 percent of its fiber requirements from Rubin Bros. Sales to Dorman Mills accounted for approximately 10 percent of the annual wool fiber sales of Rubin Bros.

For a number of years through 1957, Dorman Mills operated on a continuously unprofitable basis. As an employee and officer of Rubin Bros., a creditor and supplier of Dorman Mills, Richard was contemporaneously aware of the unprofitable operating situation at Dorman Mills.

During 1956 Dorman Mills owed Rubin Bros. on open account substantial amounts of money ranging up to $60,000 or $70,000. Because of Dorman Mills' loss record, Rubin Bros. looked upon its Dorman Mills account with apprehension.

In 1956 Thomas Dorman, the second largest shareholder in Dorman Mills, died. While administering the Estate of Thomas Dorman, the executor came to believe that Franklin Dorman, the largest shareholder in and president of Dorman Mills, was doing a poor job of managing the corporation. Because of this belief, the executor of the estate threatened a management fight with Franklin Dorman. When Rubin Bros. learned about these events, it became very concerned about the future of Dorman Mills, both as a debtor and as a long-standing and significant customer.

The Estate of Thomas Dorman owned 2,100 of the 6,000 outstanding shares of Dorman Mills. In order to avert the impending corporate troubles arising because of the animosity between Franklin Dorman and the executor of Thomas Dorman's Estate, the suggestion was

made that the estate sell its Dorman Mills shares. Because of Rubin Bros.' concern that Dorman Mills could not survive a corporate battle in view of its history of business losses, Rubin Bros. offered to buy one-half of the shares owned by the estate. Accordingly, on August 13, 1956, Rubin Bros. purchased from the estate 1,050 shares of Dorman Mills for $42,000, or $40 per share. The remaining 1,050 shares owned by the estate were simultaneously purchased by C. M. Hoff & Co., Inc. (hereinafter referred to as Hoff), for $42,000. Hoff was the exclusive selling agent for Dorman Mills. Its agency agreement with Dorman Mills, dated August 8, 1956, provided that it would remain exclusive selling agent so long as it owned shares in Dorman Mills.

On August 30, 1956, Richard purchased 7 Dorman Mills shares. On December 6, 1956, he purchased 125 shares. Thus, as of December 1956 the Rubin interests controlled 1,182 of the 6,000 outstanding shares of Dorman Mills. Their block was comprised of Richard's 132 shares and Rubin Bros.' 1,050 shares.

On February 25, 1957, Richard, among others, was elected to the board of directors of Dorman Mills.[5] In this capacity he represented his interests as well as those of Rubin Bros.

In the spring of 1957, Richard concluded that Dorman Mills required better management and more money. He therefore began exploring different ways of revitalizing its operations.

One of Richard's ideas was to become president of Dorman Mills, thereby assuming its management. Franklin Dorman rejected this idea, however, when Richard approached him with it.

Richard next suggested that Rubin Bros. acquire Dorman Mills as a subsidiary. This proposal was, however, rejected by his uncles and father, the controlling management in Rubin Bros. They rejected the idea for a variety of reasons, including the undesirability of Rubin Bros.' making a further financial commitment to Dorman Mills and the undesirability of Rubin Bros.' purchasing a company which was in competition with its other fiber customers.

Having been rebuffed in his attempt to interest Rubin Bros. in acquiring Dorman Mills as a subsidiary, Richard next attempted to negotiate a purchase from Franklin Dorman of a controlling interest in Dorman Mills under an extended payout arrangement keyed to the future profits of Dorman Mills. Franklin Dorman rejected the proposal. In the course of the discussions he made it clear that he had no desire to disassociate himself from the business of Dorman Mills at that time unless he were paid a high price for his shares.

Richard finally succeeded in developing a plan to revitalize Dorman Mills. On June 27, 1957, he executed an option agreement with Frank-

---

[5] Whether Richard was on the board of directors prior to this time is not clear from the record.

lin Dorman. The agreement gave Richard a 4-year option to purchase Franklin Dorman's 3,142 shares of Dorman Mills for $102,000. Richard was to pay an additional $48,000 if he exercised the option during the first 46 months of the 48-month option period. Throughout the term of the option, the 3,142 shares were to be held in escrow in transferable form. The agreement gave Richard the right to vote the shares during the term of the option, so long as Dorman Mills did not default in paying Franklin Dorman's salary.

Also on June 27, 1957, a contract was executed between Dorman Mills, Franklin Dorman, and Richards Associates, Inc. (hereinafter referred to as Park).[6] The contract provided that Park would manage Dorman Mills for 4 years at a compensation equal to 25 percent of the net profits of Dorman Mills in excess of $25,000. In addition, the contract provided that Richard would personally receive an expense allowance of $100 per week. Also, Park agreed to loan $20,000 to Dorman Mills. The agreement further provided that Dorman Mills would attempt to obtain additional financing, not in excess of $150,000, to which the $20,000 indebtedness to Park would be subordinated. Finally, the agreement provided that Dorman Mills would hire Franklin Dorman as a management consultant for 4 years at a fixed salary plus a percent of its profits. Richard signed the contract as president of Park.

Richard apparently did not enter into an employment contract with Park.[7] Throughout the course of the Park-Dorman Mills management-service relationship, Richard worked for Rubin Bros. and some of its subsidiaries in addition to doing his work for Dorman Mills. During the years here in issue, he received the following amounts of compensation for such work:

|  | 1960 | 1961 |
|---|---|---|
| Rubin Bros | $21,200 | $18,200 |
| Wythe | 5,400 | 4,100 |
| Milford | 2,600 | 1,800 |

At the time of the incorporation of Park, on July 1, 1957, Richard, Larry, and William were issued the following number of its common shares: Richard—70, Larry—15, William—15. On December 28, 1962, Larry sold his 15 shares to William. On September 23, 1966, William sold his 30 shares to Larry.[8] Richard has owned 70 shares

---

[6] As of June 27, 1957, Richards Associates, Inc., was not an organized corporation, but was the name of a corporation which Richard intended to organize immediately after the execution of this contract. The name of the corporation so organized on July 1, 1957, was Richards Management, Inc. On Mar. 13, 1959, its name was changed to Park International, Inc.

[7] Neither party introduced such a contract into evidence. Nor did either party refer to the existence of such a contract in the briefs.

[8] William severed his connection with Park to avoid any conflict of interest with another activity, unrelated to Park, in which he anticipated he might be engaged.

since July 1, 1957. No person other than Richard, Larry, and William has ever held shares in Park.

From July 1, 1957, to December 31, 1961, the last day of the last taxable year involved herein, Richard, William, and Larry were the three directors of Park. Throughout this period Richard was the president and secretary of Park and his brothers were its vice presidents.

During the years relevant hereto, Park had various addresses:

128 Wythe Avenue, Brooklyn, New York, which was also the address of Rubin Bros.

70 North 9th Street, Brooklyn, New York, which was also the address of Wythe [9]

257 Fourth Avenue, New York, New York, which was also the address of Hoff

1407 Broadway, New York, New York, which was also the address of Exclusive Fabrics Corp., the successor to Hoff as Dorman Mills' sales agent, and of Bradfield Mills, Inc., a wholly-owned subsidiary of Dorman Mills.

The record does not indicate whether Park ever qualified to do business under the laws of West Virginia. Dorman Mills' operations were conducted in West Virginia.

In July 1957, Dorman Mills obtained a $100,000 loan commitment from the First National Bank of Baltimore. The loan was secured by corporate machinery and by Richard's personal assets. Dorman Mills received $50,000 of the loan on July 31, 1957, and the remaining $50,000 on January 13, 1958.

In March 1958 the Research Department of the Textile Workers of America conducted a field investigation of the Dorman Mills operation under the joint sponsorship of the union and Dorman Mills. A report on the field investigation was issued. The report assessed the problems of the mill and made a wide variety of recommendations. In March 1958, Richard read this report. In April 1958, he studied a balance sheet and profit-and-loss statement for Dorman Mills for the first calendar quarter of 1958. This financial statement showed continuing and substantial losses from operations. On the basis of the field investigation report and this financial statement, Richard concluded that Dorman Mills was still in financial trouble.

In May 1958 Dorman Mills began negotiations with the Small Business Administration (hereinafter referred to as SBA) to borrow up to $250,000. The SBA indicated that it would probably require Richard to guarantee any loan Dorman Mills might obtain. Richard discussed the SBA loan with his brothers, conferring with William

---

[9] This address and the first one listed are different street addresses of the same building.

in New York City and traveling to Paris to meet with Larry. He asked his brothers to either put up additional money so that a different financial arrangement might be made for Dorman Mills or to agree to protect him to the extent of their percentage ownership in Park if he were required to personally guarantee an SBA loan. William and Larry were unwilling either to put up additional money or to protect Richard in the event that he had to guarantee an SBA loan.

Thereafter, negotiations between Dorman Mills and the SBA continued, culminating in the SBA's agreement, on or about September 24, 1958, to loan $250,000 to Dorman Mills. As finally negotiated, Richard was required to personally guarantee 50 percent of the loan and to assign as security a $50,000 life insurance policy on his life.

In the forms and correspondence pertaining to the SBA loan, Dorman Mills listed Richard as being part of its "management." It characterized his office as "General Manager." Furthermore, there were instances in the forms and correspondence where both the SBA and Dorman Mills treated the $20,000 loan between Park and Dorman Mills as if Richard, not Park, had advanced the money. After obtaining the SBA loan, an attorney for Dorman Mills requested the SBA to change its records to show the Park-Dorman Mills loan as having been made by Park and not by Richard.

At the time of securing the SBA loan, Dorman Mills deemed it desirable to eliminate Hoff as its exclusive selling agent. The selling-agency contract then in force could not be terminated unless Hoff's shares in Dorman Mills were redeemed at $40 per share. Dorman Mills thus needed a redemption fund of approximately $42,000 to eliminate Hoff as its selling agent. The SBA was unwilling or legally unable to loan money for this purpose. The required $42,000 redemption fund was therefore made available to Dorman Mills by an allocation for that purpose of the $20,000 indebtedness of Dorman Mills to Park and by an additional loan of $22,000 to Dorman Mills from Park. Park in turn borrowed $22,000 from Rubin Bros. The aggregate $42,000 indebtedness of Dorman Mills to Park was subordinated to the SBA loan. The redemption of Hoff's shares and the termination of Hoff as exclusive selling agent for Dorman Mills was effected on November 17, 1958. Thereafter, Exclusive Fabrics Corp. (hereinafter referred to as Exclusive) served as Dorman Mills' selling agent.[10]

On November 10, 1958, Richard purchased from the Estate of Franklin Dorman [11] the 3,112 shares of Dorman Mills that the dece-

_____

[10] Exclusive was apparently unrelated to the other entities and individuals involved herein.

[11] Franklin Dorman died on Oct. 7, 1957.

dent had owned. On the same day Richard purchased the 30 shares of Dorman Mills owned by Franklin Dorman's widow, Mary Dorman. Richard did not exercise the option which he had received from Franklin Dorman. He instead purchased outright the Franklin Dorman shares and the shares owned by Mary Dorman at a total price of $67,500. This was substantially less than the $150,000 which Richard would have had to pay to exercise the option in November 1958.[12]

As of November 10, 1958, the Rubin interests controlled 4,324 of the 6,000 outstanding shares of Dorman Mills. Their block was comprised of Richard's 3,274 shares and Rubin Bros.' 1,050 shares.

On November 13, 1958, the board of directors of Dorman Mills elected Richard chairman. The minutes of that meeting state that the chairman was to be the chief executive officer of the corporation.

On December 20, 1958, Richard acquired 122 shares of Dorman Mills from four minority stockholders for a total of $2,440.

By the close of 1958 Dorman Mills had commenced to operate profitably. It had an overall net profit in 1958. In and after 1959 Dorman Mills operated profitably.

On August 13, 1959, the board of directors of Dorman Mills adopted a resolution authorizing the president or any other officer of Dorman Mills to borrow on behalf of Dorman Mills $240,000 from Meinhard & Co., Inc. (hereinafter referred to as Meinhard.) [13] Prior to the meeting of the board of directors, Meinhard had indicated that it would make the loan provided that Richard continued to be actively engaged in the management of Dorman Mills. In conformance with this requirement, the board of directors declared "that no important action or actions would hereafter be taken by the Board unless Richard Rubin was present * * * or * * * would provide his approval in writing." [14]

On October 1, 1959, Meinhard made the $240,000 loan to Dorman Mills. In addition to requiring that Richard remain actively engaged in the management of Dorman Mills, Meinhard required Richard to assign to it as security a life insurance policy on his life. One purpose of the Meinhard loan was to repay the SBA loan. It also enabled Dorman Mills to repay its $42,000 debt to Park.

---

[12] The option agreement covered 3,142 shares, which would appear to include both the shares owned by Franklin Dorman and those owned by his wife.

[13] Meinhard is a factor specializing in the textile industry. It acted as a factor for Dorman Mills from Jan. 1, 1954, to July 25, 1963. During this period, Meinhard regularly required financial data on Dorman Mills.

[14] The record is not clear as to whether the board of directors complied with this resolution.

On October 6, 1959, the original contract, dated June 27, 1957, between Dorman Mills and Park was canceled and superseded by a new contract. In addition to reflecting the death of Franklin Dorman, the new agreement contained the following changes, among others, from the old agreement: (1) All of the services provided by Park would be subject to the sole direction and control of the officers and board of directors of Dorman and (2) the $100 weekly expense reimbursements would be paid to Park rather than to Richard.

On October 16, 1959, Dorman Mills made its first payment to Park, in the amount of $37,640.98, under the management contracts. At no time prior to this payment had the aggregate profits of Dorman Mills been sufficient to require a payment to Park under the appropriate contract. At approximately this time, Dorman Mills repaid its $42,000 debt to Park. Park in turn repaid its $22,000 debt to Rubin Bros.

On January 18, 1960, Richard acquired from Rubin Bros. its 1,050 shares of Dorman Mills at $40 per share.

Early in 1960, Dorman Mills organized a New York subsidiary, Bradfield Mills. Dorman Mills organized Bradfield Mills to serve as its sales agent, along with Exclusive.

On June 9, 1960, Richard sold 467 shares of Dorman Mills stock to John Abt (hereinafter referred to as Abt) and Hunter Wilson (hereinafter referred to as Wilson), shareholders and salaried employees of Exclusive. Neither Abt nor Wilson is related to Richard.

On June 29, 1960, Exclusive, Abt, Wilson, and Bradfield Mills entered into an agreement designating Exclusive as selling agent for the products of Dorman Mills in the women's-wear field for a period of 3 years effective January 1, 1960. The effect of the agreement was to leave Bradfield Mills as selling agent for the products of Dorman Mills in the men's-wear field.

The agreement of June 29, 1960, required Exclusive to provide the services of Abt and Wilson in discharging its duties as Dorman Mills' selling agent. The agreement provided for compensation to Exclusive of a flat sum of $58,500 plus expenses and a percentage participation in the combined net profits of Bradfield Mills and Dorman Mills.

On or about June 29, 1960, the contract between Dorman Mills and Park dated October 6, 1959, was superseded by a new agreement effective January 1, 1960. The June 29, 1960, agreement contained the following changes from the October 6, 1959, agreement: (1) Park's services were to be provided to Dorman Mills' subsidiaries, including Bradfield Mills, as well as Dorman Mills and (2) Park's compensation was to consist of 25 percent of the combined net profit of Dorman

Mills and Bradfield Mills without a $25,000 deductible, plus 25 percent of the gross receipts of Exclusive from all sources except advances from Bradfield Mills or Dorman Mills, less authorized expenses incurred and paid by Exclusive.

From July 1960 to July 1963, the agreements between Park and Dorman Mills and between Bradfield Mills, Exclusive, Abt, and Wilson remained in effect, substantially unchanged.

From April 1961 to October 1961, inclusive, Richard purchased 101 shares of Dorman Mills from various minority shareholders.

On January 27, 1961, the board of directors of Dorman Mills adopted a resolution authorizing a second loan from Meinhard. On December 29, 1961, the board of directors of Dorman Mills authorized a third loan from Meinhard. The note covering this loan provided for Richard's continued active participation in the management of Dorman Mills.

On November 26, 1962, the board of directors of Dorman Mills adopted a resolution authorizing a $200,000 loan from the Tucker County Bank, Parsons, W. Va. The purpose of the authorization was to repay the outstanding Meinhard loan. The Tucker County Bank loan was to be secured by the land and buildings of Dorman Mills plus the assignment of a $100,000 life insurance policy on Richard's life.[15]

On July 25, 1963, Richard, Abt, and Wilson entered into an agreement to sell their shares of Dorman Mills to United Merchants & Manufacturers, Inc. (hereinafter referred to as United Merchants), a large publicly held corporation. The sale was consummated on August 23, 1963. Pursuant to the sale agreement, all the shares of Dorman Mills owned by persons other than Richard, Abt, and Wilson were redeemed on August 23, 1963. United Merchants thereby became the sole shareholder of Dorman Mills. The purchase price for the shares of Richard, Abt, and Wilson was 80 percent of the consolidated book value of Dorman Mills and Bradfield Mills, plus 35 percent of Dorman Mills' "Consolidated Net Operating Profit," as defined in the sale agreement for the 4 years commencing on July 1, 1963.

United Merchants acquired Dorman Mills for at least two reasons. It wanted a woolen operation of the type conducted by Dorman Mills and it wanted Richard's services.

---

[15] The record does not disclose whether Dorman Mills in fact borrowed $200,000 from the Tucker County Bank.

Pursuant to the terms of the July 25, 1963, sale agreement, the contract between Dorman Mills and Park was canceled as of June 30, 1963. As of July 1, 1963, Richard entered into a 4-year employment contract with Dorman Mills.[16] These changes were insisted upon by United Merchants in its negotiations with Richard, Abt, and Wilson.

In requiring Park and Dorman Mills to cancel their contract, United Merchants was motivated by various considerations. It was contrary to United Merchants' corporate policy and method of doing business to contract with a corporation to secure the services of a particular individual. Furthermore, United Merchants wanted Richard's services in areas other than the Dorman Mills operation.

In his employment agreement of July 1, 1963, with Dorman Mills, Richard agreed to act as chairman of the board and chief executive officer of Dorman Mills and to receive an annual salary of $35,000.[17] By its terms, the employment agreement was not assignable. Since United Merchants acquired Dorman Mills, Richard has managed Dorman Mills as an employee-officer. There was no change in the general operation of Dorman Mills after it became a subsidiary of United Merchants. Effective December 1, 1965, Richard was appointed director of a new office for Market Planning and Analysis for United Merchants.

In or about September 1959, Larry, Richard, and William met in New York to discuss Park's use of its anticipated income from Dorman Mills. In the course of the conference, Larry suggested that Park enter the art field, an area in which he and William are expert. His brothers accepted the suggestion. In the conduct of Park's art business, William and Larry played the key roles while Richard occupied a subordinate role relating to certain financial and contractual aspects of the business.

On October 16, 1959, as noted earlier, Dorman Mills paid a $37,640.98 fee to Park. At approximately this time, Dorman Mills repaid its $42,000 debt to Park. Park in turn transmitted $22,000 to Rubin Bros. Park invested the fee and the retained $20,000 loan repayment in paintings.

The following financial data are culled from the Federal corporate income tax returns of Park:

---

[16] After Aug. 23, 1963, Dorman Mills was operated as a subsidiary of United Merchants.

[17] Prior to United Merchants' acquisition of Dorman Mills, Richard never received any direct compensation from Dorman Mills other than $180 annual director's fees. For awhile, however, Dorman Mills paid Richard $100 a month as an expense allowance.

| | | | | Fiscal year ended June 30— | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1958 | 1959 | 1960 | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 |
| Income (gross): | | | | | | | | | |
| Dorman Mills contract | 0 | 0 | $51,531.68 | $33,147.52 | $34,912.48 | $63,097.59 | 0 | 0 | 0 |
| Art business | 0 | 0 | 16,641.59 | 22,294.61 | 15,782.14 | 25,803.63 | $55,481.68 | $56,139.05 | $48,591.21 |
| Investment | 0 | 0 | 0 | 0 | 0 | 0 | 4,253.27 | 1,105.86 | 1,706.02 |
| Salaries: | | | | | | | | | |
| Richard | 0 | 0 | 15,000.00 | 6,150.00 | 5,000.00 | 25,000.00 | 3,000.00 | 5,500.00 | 3,000.00 |
| William | 0 | 0 | 10,999.20 | 11,300.00 | 12,500.00 | 4,000.00 | 7,000.00 | 5,000.00 | 3,000.00 |
| Lawrence | 0 | 0 | 9,625.00 | 6,325.00 | 6,820.00 | 0 | 0 | 0 | 0 |
| Nonsalary, Expenditures [1] | 0 | $182.68 | 16,846.21 | 18,622.69 | 17,376.05 | 41,960.07 | 39,055.57 | 44,137.74 | 49,533.14 |
| Inventory, Art business | 0 | 0 | 52,719.00 | 93,281.01 | 84,947.42 | 131,099.51 | 147,459.99 | 138,006.55 | 149,612.76 |

[1] This figure includes nondeductible items such as Federal income taxes.

All management fees received by Park were attributable to services performed for Dorman Mills or its subsidiary, Bradfield Mills. Richard performed all the management services for which fees were paid to Park.

In dealing with independent third parties during the times and with respect to the events relevant hereto, Dorman Mills often ignored the existence of Park and held Richard out as part of its management. In dealing with banking and other financial institutions, for example, Dorman Mills portrayed Richard as its general manager. Independent third parties dealing with Dorman Mills during the times and with respect to the events relevant hereto frequently either did not know about or ignored the existence of Park and viewed Richard as an employee of Dorman Mills. Some of the personnel at Meinhard, for example, either did not know about or ignored the existence of Park. These people viewed Richard as a key employee of Dorman Mills.

In dealing with Dorman Mills during the times and with respect to the events relevant hereto, Richard generally respected the existence of Park. In writing letters to Dorman Mills, for example, Richard usually wrote on stationery with a Park letterhead. In dealing with Richard during the times and with respect to the events relevant hereto, Dorman Mills generally respected the existence of Park. Dorman Mills paid Park, for example, for the services which Richard rendered under the management service contracts between Park and Dorman Mills.

On its Federal corporate income tax returns during the years relevant hereto, Park consistently reported as part of its gross income the fees received from Dorman Mills and deducted the expenses allocable thereto. On his Federal individual income tax returns for the taxable years 1960 and 1961, Richard reported as salary received from Park $8,750 and $6,900, respectively.

In his statutory notice of deficiency for the taxable years 1960 and 1961, respondent determined that "income reported as management fees by Park International, Inc. and related expenses deducted by Park International, Inc. are allocable to you [Richard]." Respondent allocated the following amounts:

|  | 1960 | 1961 |
|---|---|---|
| Income | $51, 581. 68 | $33, 147. 52 |
| Expense | 16, 042. 56 | 5, 659. 18 |

The allocated amounts were computed as follows:

| Year | Item | Computation |
|------|------|-------------|
| 1960 | Income | All the management income reported by Park for the fiscal year ended June 30, 1960 |
| 1960 | Expenses | One-half of a portion of certain expenses deducted by Park for the fiscal years ended June 30, 1960, and June 30, 1961 |
| 1961 | Income | All the management income reported by Park for the fiscal year ended June 30, 1961 |
| 1961 | Expenses | One-half of a portion of certain expenses deducted by Park for the fiscal year ended June 30, 1961 |

Prior to the trial herein, the parties stipulated that the correct amounts of income and expense subject to allocation to Richard, if any allocation is permitted, are:

|  | 1960 | 1961 |
|------|------|------|
| Income | $25, 269. 37 | $59, 822. 90 |
| Expense | 17, 184. 28 | 17, 041. 57 |

By amended answer and concession, respondent conformed the asserted deficiencies to this stipulation.

Prior to the trial herein, respondent's counsel orally informed Richard's counsel that respondent would rely upon sections 61 and 482.

### OPINION

The substantive issue is whether petitioner is taxable on the net management-service income which Park received from Dorman Mills. One of respondent's positions with respect to the issue is that petitioner is taxable on the net income pursuant to section 61. The theory of his position is that petitioner, not Park, in substance earned the income. As the following sentence from respondent's reply brief demonstrates, he is not here attacking the validity of Park for tax purposes: "The respondent has never questioned the validity of Park from the time it commenced to do business (in the buying and selling of art objects in 1959)." Respondent is, rather, attacking the validity for tax purposes of the purported transactions between petitioner and Park and between Park and Dorman Mills. For an illustration of the difference between attacking the validity of a corporation and attacking the validity of transactions purportedly entered into by the corporation, see *Commissioner* v. *Laughton*, 113 F. 2d 103 (C.A. 9, 1940), remanding 40 B.T.A. 101 (1939).

From a review of all the evidence herein, we conclude that respondent's position with respect to section 61 is correct. Petitioner controlled Park by virtue of his 70-percent ownership of its stock. He also controlled Dorman Mills. He first controlled it through the combination of his outright ownership of its stock and his option to purchase its stock which gave him voting power during the option

period. After acquiring the shares of Franklin Dorman and Mary Dorman, he controlled Dorman Mills through outright ownership of stock alone. In view of petitioner's control of both Park and Dorman Mills, respondent determined that the substance of the transactions involved herein was different than their form. In form petitioner worked for Park, Park managed Dorman Mills, and the excess of the net Dorman Mills' fees over petitioner's salary remained in Park for use in its art business. Respondent in effect determined that in substance petitioner worked directly for Dorman Mills and from time to time contributed part of his compensation to Park's capital for use in its art business. In the face of this determination, where petitioner controlled both Park and Dorman Mills, petitioner has the burden of proving that there was substance in or an economic purpose for casting his transaction in the form he chose. *Helvering* v. *Gregory*, 69 F. 2d 809 (C.A. 2, 1934), affd. 293 U.S. 465 (1935); *National Investors Corporation* v. *Hoey*, 144 F. 2d 466 (C.A. 2, 1944). See also Judge Hand's dissenting opinion in *Gilbert* v. *Commissioner*, 248 F. 2d 399, 410 (C.A. 2, 1957), remanding a Memorandum Opinion of this Court. Compare Chirelstein, "Learned Hand's Contribution to the Law of Tax Avoidance," 77 Yale L.J. 440 (1968). On the record before us, we cannot conclude that petitioner has discharged his burden. We see no business purpose in the form chosen by petitioner. Furthermore, there is evidence in the record that even petitioner did not always respect the form in which he cast his transaction. Such evidence affirmatively indicates that the substance of petitioner's transaction was different than its form. We therefore conclude that in substance petitioner worked directly for Dorman Mills. It follows that petitioner is taxable under section 61 on the net management-service income which Park received from Dorman Mills.

Another way to reach this result, although perhaps only semantically different from the above discussion, is through the "assignment of income" doctrine initiated in *Lucas* v. *Earl*, 281 U.S. 111 (1930). The rule of that case is that income is taxed to the true earner thereof. In applying this rule to a situation involving a corporation which supplies personal services for a fee, the difficulty is deciding who "earns" the income in question. We think the decision turns upon the question of who controls the earning of the income. See *Hogle* v. *Commissioner*, 132 F. 2d 66 (C.A. 10, 1942), reversing 46 B.T.A. 122 (1942). In the words of two coauthors writing on the subject:

The distinction in these cases is grounded on the question of who has the ultimate direction and control over the earning of this compensation. If such control lies with the taxpayer who actually performs the services, then he remains taxable on the earnings from his personal services, whether or not he chooses to divert the receipt of that compensation to a third party. However, if the direction and control of the performer's activities resides in a superior authority, and the consideration paid for the performance of those services is

made to the person having such ultimate direction and control, then the mere fact that the taxpayer has performed the services does not render him taxable on the amount paid for these services. [Footnotes omitted.] Lyon and Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax L. Rev. 393 (1962)]

From the record as a whole, we think petitioner clearly directed and controlled the earning of the income here in question. Petitioner negotiated the management service contract before Park was incorporated. He signed the contract—albeit in the capacity of an officer of Park—before Park's creation. After Park was incorporated and while the management service contract was being performed, petitioner worked for Rubin Bros. and some of its subsidiaries in addition to doing his work for Dorman Mills. When United Merchants bought petitioner's controlling interest in Dorman Mills, the Park-Dorman Mills contract was terminated without benefit or consideration to Park. These facts demonstrate that petitioner, not Park, directed and controlled the earning of the income in question. It follows that petitioner is taxable on the income under section 61 pursuant to the assignment-of-income doctrine.

Petitioner relies on *Fontaine Fox*, 37 B.T.A. 271 (1938), and *Charles Laughton*, 40 B.T.A. 101 (1939), remanded 113 F. 2d 103 (C.A. 9, 1940), cases similar in some respects to the case at bar.[18] In *Fox*, the taxpayer was a cartoonist. He created a corporation, Reynard, in which he owned all the stock except qualifying shares. He entered into a contract with Reynard for a term of years under which he was obligated to furnish a specified number of cartoons in return for a specified salary. Reynard entered into a contract to sell the cartoons to Bell Syndicate, a corporation in the business of distributing features to newspapers. In *Charles Laughton*, the taxpayer was a movie actor. He created a corporation, Industries, Ltd., in which he owned all the stock except qualifying shares. He entered into a contract with Industries, Ltd., for a term of years under which he was obligated to furnish services in return for a specified salary. Industries, Ltd., entered into several contracts to furnish Laughton's services to film makers such as Metro-Goldwyn-Mayer, Paramount, and Twentieth Century Pictures, Inc. In both *Fox* and *Charles Laughton* the Government claimed that the taxpayers were taxable on the incomes earned by the corporations. We held against this contention in both cases.

These cases are distinguishable from the case at bar in at least two vital respects.[19] In *Fox* and *Charles Laughton* the taxpayers were

---

[18] Petitioner also relies on a Memorandum Opinion of this Court, filed May 26, 1961, *Robert E. Wilgus*, which is similar on its facts to *Fontaine Fox*, 37 B.T.A. 271 (1938), and *Charles Laughton*, 40 B.T.A. 101 (1939), remanded 113 F. 2d 103 (C.A. 9, 1940).

[19] While the opinions in *Fox* and *Charles Laughton* contain discussions of the assignment-of-income doctrine, they do not contain discussions of the substance-over-form point involved herein. Their discussions of substance over form go to the validity of the corporation, while the discussion in the present case goes to the validity of transactions purportedly entered into by the corporation.

contractually bound to render services exclusively to their corporations. In the present case, petitioner was free to do and did engage in other work. The absence of exclusiveness in the case at bar is important because it is evidence that petitioner, not Park, directed and controlled the earning of the income in question. Furthermore, in *Fox* and *Charles Laughton* the taxpayers' corporations transacted business with corporations in which the taxpayers owned either no interest or no substantial interest.[20] In other words, the taxpayers in these cases only controlled one of the parties to the transaction. As illustrated in the discussion above, the element of control is important to both the substance-over-form doctrine and the assignment-of-income doctrine. Because of the vital differences between the case at bar and *Fox* and *Charles Laughton*,[21] the latter are not controlling herein.

Petitioner makes an argument based on various provisions of past excess profits tax laws relating to personal service corporations. Petitioner's brief very capably traces the history of these provisions. Petitioner concludes from this discussion that any decision in the present case adverse to him would be contrary to the spirit, if not the letter, of these laws.

The primary difficulty with the argument is that it begs the very question we are called on to decide. As typified by the following passage from petitioner's original brief, the argument is premised upon a corporation which earns personal service income:

it is perfectly clear that Congress expected and intended that the income of a personal service corporation would be taxed to that corporation at ordinary corporate rates.

In the present case, however, the question to be decided is whether Park earned the personal service income in dispute. Had we come out differently on this question, we would have no quarrel with the above-quoted passage.

Another problem with petitioner's argument concerning personal service corporations under the excess profits tax is that he appears to argue a matter not in issue. As demonstrated by the following passage from petitioner's original brief, petitioner appears to think respondent is attacking Park's viability for tax purposes: "Congress long has recognized the tax validity of the personal service corporation." As we point out above, respondent is not here contesting Park's validity

---

[20] In *Fox* at page 274, the Court found as a fact that the taxpayer never owned any interest in Bell. While the Court in *Charles Laughton* said nothing on the point, we think it is fair to assume that Laughton did not own any substantial interest, if any interest at all, in film makers such as Metro-Goldwyn-Mayer and Paramount. If he had owned such an interest, we think the Court would have pointed it out in view of the circumstances of the case.

[21] The Memorandum Opinion of this Court, referred to in fn. 18, is also distinguishable from the case at bar. It is distinguishable on the same grounds upon which we distinguish *Fox* and *Charles Laughton.*

for tax purposes. We therefore assume respondent would not dispute the last-quoted passage.

Petitioner makes an argument based on section 543 (a) (7),[22] one of the personal holding company provisions. Petitioner's brief again very capably traces the history of the provision in question. The discussion points out that the Government was having trouble taxing the earnings of incorporated-talent corporations directly to the talented person. For this reason, the discussion continues, Congress enacted the predecessor of section 543 (a) (7) to penalize such corporations by making them personal holding companies. Because Congress enacted the predecessor of section 543 (a) (7), petitioner concludes, the Government may no longer attempt to tax the earnings of an incorporated-talent corporation to the talented person.

We do not agree. Petitioner's discussion does not persuade us that Congress intended in any way to limit the Government's approaches to tax avoidance by enacting the predecessor of section 543 (a) (7). We think Congress was giving the Government a second tool, not replacing one with another. It may or may not be wise for the Government to have two approaches to a given situation. It is not, however, our function to decide the wisdom of this policy.

Petitioner's brief very eloquently invites us to consider the abstract question of the tax treatment of all small corporations rendering personal services for a fee. We however decline the invitation. In fact, we want to emphasize that our decision in the present case is based on its particular facts and circumstances. However, to dispel the concern expressed in petitioner's brief that no small personal service corporation will ever be given credence for tax purposes if we hold against him, we point to *Fox* and *Charles Laughton* where, under facts significantly different than those herein, the small personal service corporations were given complete credence.

---

[22] SEC. 543(a). GENERAL RULE.—For purposes of this subtitle, the term "personal holding company income" means the portion of the adjusted ordinary gross income which consists of:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(7) PERSONAL SERVICE CONTRACTS.—

(A) Amounts received under a contract under which the corporation is to furnish personal services; if some person other than the corporation has the right to designate (by name or by description) the individual who is to perform the services, or if the individual who is to perform the services is designated (by name or by description) in the contract; and

(B) amounts received from the sale or other disposition of such a contract.

This paragraph shall apply with respect to amounts received for services under a particular contract only if at some time during the taxable year 25 percent or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for the individual who has performed, is to perform, or may be designated (by name or by description) as the one to perform, such services.

[During the taxable years in question, this provision was sec. 543.(a) (5) and was renumbered sec. 543 (a) (7) by sec. 225 (d), Pub. L. 88–272 (Feb. 26, 1964).]

We therefore hold that petitioner is taxable under section 61 on the net management-service income which Park received from Dorman Mills. Petitioner does not argue that less than 100 percent of said income is allocable to him, in the event any is so allocable.[23] We accordingly hold him taxable on the full amount of the net management-service income which Park received from Dorman Mills.

In addition to the substantive issue involved herein there are procedural issues. One of these is whether respondent has the burden of proof with respect to the increase in the deficiency for 1961 which he requested in his amended answer. Petitioner argues that respondent raised a "new matter" when he asserted an additional deficiency. It follows, petitioner contends, that respondent has the burden of proof with respect to the additional deficiency pursuant to Rule 32, Tax Court Rules of Practice.

Another procedural issue is whether respondent has the burden of proof with respect to the entire deficiency as finally asserted for both 1960 and 1961. Petitioner claims that the statutory notice of deficiency is arbitrary and unreasonable because it contains an allocation of the wrong amounts of income and deductions. It follows, petitioner argues, that the burden of proof should shift to respondent.

We need not consider these procedural issues. Our holding with respect to the substantive issue is based upon two grounds. The second ground, which invokes the assignment of income doctrine, is not founded upon a failure of proof by petitioner. Even if we were to hold that respondent has the burden of proof, we would still hold against petitioner on the substantive issue because of the second ground. It follows that issues concerning the burden of proof are moot.

Because of our disposition of the issues discussed above, it is not necessary to consider the other issues raised herein.

*Decision will be entered under Rule 50.*

---

[23] Petitioner makes a brief argument to this effect with respect to respondent's allocation under sec. 482. But he does not extend the argument to respondent's allocation under sec. 61.